SIDLEY AUSTIN LLP
Thomas R. Califano (24122825)
Rakhee V. Patel (00797213)
Jeri Leigh Miller (24102176)
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone:    (214) 981-3300
Facsimile:    (214) 981-3400
Email:    tom.califano@sidley.com
          rpatel@sidley.com
          jeri.miller@sidley.com

SIDLEY AUSTIN LLP
Andres Barajas  (*pro hac vice* pending)
Weiru Fang (*pro hac vice* pending)
787 Seventh Avenue
New York, New York 10019
Telephone:    (212) 839-5300
Facsimile:    (212) 839-5599
Email:    andres.barajas@sidley.com
          weiru.fang@sidley.com

*Proposed Attorneys for the Debtors*
*and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| EBIX, INC., *et al.*[1] | Case No. 23-80004 (SWE) |
| Debtors. | (Joint Administration Requested) |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Ebix, Inc. (1975), Vertex, Inc. (6295), PB Systems, Inc. (9074), Ebix Consulting, Inc. (6666), Ebix US, LLC (N/A), Facts Services, Inc. (1348), Doctors, Exchange, Inc. (N/A), Ebix International LLC (N/A), Agency Solutions.com, LLC d/b/a/ Health Connect LLC (N/A), ConfirmNet Corporation (2737), A.D.A.M., Inc. (8070), and Ebix Latin America, LLC (N/A).  The Debtors' mailing address is 1 Ebix Way, Johns Creek, Georgia 30097.

**DECLARATION OF RICHARD W. MORGNER
IN SUPPORT OF THE DEBTORS' EMERGENCY MOTION
FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING
(A) POSTPETITION FINANCING, AND (B) THE USE OF CASH COLLATERAL;
(II) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE
EXPENSE CLAIMS; (III) GRANTING ADEQUATE PROTECTION
TO PREPETITION LENDERS; (IV) MODIFYING THE AUTOMATIC STAY;
(VI) SCHEDULING A FINAL HEARING; AND (VII) GRANTING RELATED RELIEF**

I, Richard W. Morgner, hereby declare under penalty of perjury as follows:

1. I submit this declaration (this "Declaration") in support of the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing (A) Postpetition Financing, and (B) The Use of Cash Collateral; (II) Granting Liens and Providing Superpriority Administrative Expense Claims; (III) Granting Adequate Protection to Prepetition Lenders; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* (the "Motion"),[2] which seeks approval of a new money postpetition financing facility (the "DIP Facility"). Pursuant to the Interim Order and subject to the terms of the DIP Credit Agreement, the Debtors are seeking access to new money term loans in an aggregate principal amount of $35 million (such loans, the "New Money DIP Loans," and the commitments in respect thereof, the "DIP Facility Commitment"), of which $15 million will be available immediately upon entry of the Interim Order, with the remainder to be available in accordance with the DIP Documents and the Approved Budget. In addition, the Debtors are seeking, upon entry of the Final Order, a "roll up" of $70 million in the aggregate principal amount of outstanding prepetition term loans and revolving loans (the "Roll-Up Loans" and together with the New Money DIP Loans, the "DIP Facility Loans").[3]

---

[2] Capitalized terms used but not defined herein have the meanings given to such terms in the Motion or the First Day Declaration (as defined below).

[3] The material terms of the proposed DIP Facility are set forth in detail in the Motion. For the avoidance of doubt, any description of the proposed terms of the DIP Facility herein or in the Motion is qualified in its entirety by reference to the DIP Credit Agreement.

2

2. I understand that the Debtors have also submitted, in support of the Motion, the *Declaration of Amit Garg, Chief Financial Officer of Ebix, Inc., in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), contemporaneously herewith, which is incorporated by reference herein. I also make reference to my declaration in support of the *Debtors' Motion for Entry of Orders (I)(A) Approving Bid Procedures; (B) Approving the Debtors' Entry Into the Stalking Horse APA And Approving Bid Protections; (C) Scheduling Auction and Sale Hearing; (D) Approving the Form and Manner Of Notices Relating to the Sale Transaction; (E) Approving Assumption And Assignment Procedures; (II) Authorizing the Sale Transaction and (III) Granting Related Relief*, filed contemporaneously herewith (the "Bidding Procedures Motion").

3. The statements in this Declaration are, except where specifically noted, based on my personal knowledge or opinion, on information that I have from the Debtors' advisors or employees working directly with me or under my supervision, direction, or control, or from the Debtors' books and records maintained in the ordinary course of business. I am not being specifically compensated for this testimony other than through payments received by Jefferies LLC ("Jefferies") as a professional proposed to be retained by the Debtors (including certain financing fees). I am over the age of 18 and authorized to submit this declaration on behalf of the Debtors. If I were called upon to testify, I could and would competently testify to the facts set forth herein.

**Professional Background and Qualifications.**

4. I am a Managing Director and Joint Global Head of the Debt Advisory & Restructuring Group at Jefferies, a global investment banking firm founded over 50 years ago, with its principal office located at 520 Madison Avenue, New York, New York 10022. Jefferies

3

is a registered broker-dealer with the United States Securities and Exchange Commission and is a member of the Financial Industry Regulatory Authority and the Securities Investor Protection Corporation. Jefferies, together with its investment banking advisory affiliates, has over 5,000 employees located in more than 30 offices around the world. Jefferies and its senior professionals have extensive expertise providing investment banking services to financially distressed companies, creditors, committees, equity holders, asset purchasers, and other constituencies in reorganization proceedings and complex financial restructurings, both in and out of court.

5. I have more than 30 years of investment banking and restructuring experience. Since joining Jefferies in 2009, I have provided investment banking expertise, and distressed mergers and acquisition and financing advice to companies, lenders, and investors in both in- and out-of-court restructurings. Prior to joining Jefferies, I was a Managing Director and Co-Head of the mergers and acquisitions group at Miller Buckfire, where my primary responsibilities included advising companies and investors in restructuring, distressed mergers and acquisitions, distressed financing, and special situations.

6. I have personally led or had material involvement in approximately 30 chapter 11 cases over the last 20 years. Examples of some of these cases where I was involved in a sale process include: *AppHarvest Products, LLC* (Bankr. S.D. Tex.), *Vewd Software USA, LLC* (Bankr. S.D.N.Y.), *NPC International, Inc.* (Bankr. S.D. Tex.), *CarbonLite Holdings* (Bankr. D. Del.), *GenCanna Global* (Bankr. E.D. Ky.), *Dura Automotive Systems* (Bankr. D. Del.), *Hanjin Shipping Co.* (Bankr. D.N.J.), *Black Diamond Mining Co.* (Bankr. E.D. Ky.), *Dana Corporation* (Bankr. S.D.N.Y.), *Sundevil Power Holdings* (Bankr. D. Del.), *BMC Holdings* (Bankr. D. Minn.), and *Magnatrax* (Bankr. D. Del.).

**General Background**

7. As set forth more fully in the First Day Declaration, the Debtors are a leading international provider of a variety of technology services, focusing on the insurance, financial services, travel, and healthcare industries. The Debtors' main focus is to design and deploy a wide variety of insurance and reinsurance exchanges on an on-demand basis using software-as-a-service enterprise solutions in areas of customer relationship management, front-end and back-end systems, and outsourced administrative and risk compliance.

8. The Debtors retained Jefferies as their investment banker in 2021 to, among other things, advise the Debtors and facilitate outreach in connection with an evaluation of the Debtors' immediate financing needs and potential strategic transactions, including bridge financing and asset sales. Jeffries launched a marketing process on behalf of the Debtors to explore capital raise opportunities in an effort to refinance the maturing Prepetition Credit Facility (as defined in the First Day Declaration). Despite Jefferies' robust marketing process, including engagement with over a hundred parties, the Debtors did not ultimately receive any acceptable refinancing offers, and determined to terminate the process.

9. The Debtors re-engaged Jefferies on November 25, 2022, to launch another refinancing effort, including engagement with over ninety investors, which ultimately resulted in a binding letter of intent with a potential financing party. However, the negotiations with this potential counterparty did not advance for various reasons, including an inability to reach mutually acceptable terms between the potential counterparty and the Prepetition Lenders.

10. In February 2023, the Company and Jefferies launched a sale process for a portion of the Company's assets, which received significant interest from both strategic and institutional buyers. This process was pursued in parallel with the EbixCash IPO process (as discussed in the

First Day Declaration), and ultimately resulted in two bidders being selected to continue to further due diligence.

11. Jefferies has been integrally involved in the negotiations with existing Prepetition Lenders under the Debtors' Credit Facility, other creditors and stakeholders, and third parties. In addition, Jefferies, together with the Debtors' other advisors and management, has been assisting the Debtors in (i) the negotiation of the DIP Facility and assessment of alternative financing options and (ii) running a comprehensive sale and marketing process for substantially all of the Debtors' assets.

### The Debtors' Immediate Need for Postpetition Financing.

12. As part of the Debtors' preparations for these chapter 11 cases and prepetition discussions with potential capital raise providers, the Debtors, with the assistance of Jefferies, the Debtors' financial advisor, AlixPartners LLP ("Alix") and the Debtors' legal advisor, Sidley Austin LLP, evaluated the Debtors' financing needs and funding alternatives. Jefferies also assessed the state of the market in which the Debtors would be seeking financing and then canvassed the market for potential debtor-in-possession financing from existing stakeholders and third parties, as discussed herein.

13. Based on discussions with the Debtors and Alix, I am generally familiar with the Debtors' current liquidity and liquidity forecast based on forecasts prepared by the Debtors' management team and Alix. I have reviewed the Approved Budget prepared by the Debtors and Alix and agreed upon with the DIP Lenders. I believe that the DIP Facility should provide the Debtors with enough liquidity to continue the operation of their business, maintain relationships with vendors, suppliers and customers, satisfy wage and salary obligations, and continue to satisfy other working capital and operational needs during the chapter 11 cases. I further believe that the

DIP Facility is designed to provide the Debtors with sufficient liquidity to undertake the transactions contemplated by the Restructuring Support Agreement (the "RSA"), including continuing the marketing process for the Debtors' assets that began prior to the Petition Date. This funding should allow the Debtors to maximize value of their assets to the benefit of all key stakeholders and creditors by preserving the Debtors' going concern value.

**The Debtors' Efforts to Obtain Postpetition Financing.**

14. In my role as the Debtors' investment banker, I was actively involved in the solicitation of proposals to procure DIP financing, as well as in the negotiation process. Based on my experience in negotiating DIP financings in a multitude of other situations over the last thirty (30) years, and involvement in the marketing and negotiation of the various DIP financing options available to the Debtors, including engaging in good faith and arms' length negotiations with the potential lenders, I believe the DIP Facility is the best financing available to the Debtors under the circumstances.

15. To allow more time for the prosecution of certain strategic alternatives, the Debtors, with the assistance of their advisors, secured two extensions of the maturity date of the Prepetition Credit Facility, from February 2023 through September 30, 2023, and then entered into forbearance with the requisite lenders under the Prepetition Credit Facility to provide additional time to pursue a value-maximizing transaction.

16. During the forbearance period, Jefferies canvassed the market to assess whether any financing would be available by any party on better terms than those offered by the Prepetition Lenders. Jefferies considered a wide variety of potential alternative lenders, including third-party financial institutions experienced in distressed lending and financings. Jefferies initiated outreach to eleven (11) parties as part of the capital raise process. Ultimately, as of the Petition Date, all

eleven (11) parties declined or were unable to provide any competing debtor-in-possession financing, primarily citing (i) the unwillingness to provide new money capital on a junior and non-priming basis and (ii) current risk profile.

17. Ultimately, the Debtors, in consultation with Jefferies, determined that there was no better alternative financing other than that being offered by the Prepetition Lenders. It is my understanding, following a perfection review by Debtors' counsel, that substantially all of the Debtors' assets are encumbered and subject to validly perfected liens by the Prepetition Lenders. There was no financing party who was willing to provide financing on a junior basis to the Prepetition Lenders. And obtaining financing on a priming basis would have involved a lengthy and likely costly fight with the Prepetition Lenders.

18. Accordingly, the Debtors and Jefferies, along with the Debtors' other advisors, focused their efforts on negotiating the terms and provisions of the DIP Facility with the Prepetition Lenders. Nonetheless, the Debtors have the ability to continue a marketing process to obtain better financing during the period between entry of the Interim Order and Final Order, subject to the consent of the DIP Lenders and the Prepetition Lenders.

## The DIP Facility Was Negotiated in Good Faith and At Arm's Length.

19. The DIP Facility is the product of extensive, good faith, arm's length negotiations among the Debtors, the DIP Lenders, and the DIP Agent, each of which was represented by experienced counsel and financial advisors. The Debtors and the Debtors' advisors actively negotiated the terms and provisions of the DIP Facility leading up to the Petition Date, including

on material terms of the proposed financing, including the economics and covenants, ultimately resulting in the deal embodied in the DIP Credit Agreement.

20. I believe the interest payments and fees contemplated by the DIP Facility are comparable to other debtor in possession financings and generally consistent with market terms for companies facing similar circumstances as the Debtors.

21. Further, I believe that the claim priority, liens, and other protections (including a "roll up" of prepetition claims under the Credit Facility upon entry of the Final Order) to be granted to the DIP Lenders pursuant to the DIP Facility, were essential features of the facility, without which the DIP Lenders would not have committed to provide funding for the Debtors, and are comparable to other debtor in possession financings and generally consistent with market terms for companies facing similar circumstances as the Debtors. The "roll up" will benefit the Debtors and their estates because it will enable the Debtors to obtain urgently needed financing critical to administering these chapter 11 cases and funding their operations, which financing would not otherwise be available.

22. Finally, the DIP Credit Agreement also contains certain milestones (as described more fully in the First Day Declaration) that the Debtors must meet throughout these chapter 11 cases. The milestones were negotiated by the Debtors and the DIP Lenders as a condition to providing the DIP Facility and are the result of extensive good faith and arm's length negotiations between the Debtors and the DIP Lenders. I believe that the timelines dictated by the DIP Facility provide the Debtors with sufficient time to market their assets while balancing the need for an expeditious exit from these cases.

23. Accordingly, based on my experience with debtor-in-possession financing transactions, as well as my involvement in the negotiation of the DIP Facility and pursuit of

alternative post-petition financing proposals, I believe the DIP Facility is the best financing available to the Debtors under the circumstances and will allow the Debtors to continue the marketing process commenced prepetition to maximize the value of the Debtors' estate for the benefit of all parties in interest. I believe that the terms of the DIP Facility taken as a whole are fair and reasonable and are the most favorable terms the Debtors could obtain under the circumstances, and the DIP Facility should be approved.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

December 18, 2023                                   */s/ Richard W. Morgner*
                                                    Richard W. Morgner