SIDLEY AUSTIN LLP
Thomas R. Califano (24122825)
Rakhee V. Patel (00797213)
Jeri Leigh Miller (24102176)
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone:    (214) 981-3300
Facsimile:    (214) 981-3400
Email:    tom.califano@sidley.com
rpatel@sidley.com
jeri.miller@sidley.com

SIDLEY AUSTIN LLP
Andres Barajas (pro hac vice pending)
Weiru Fang (pro hac vice pending)
787 Seventh Avenue
New York, New York 10019
Telephone:    (212) 839-5300
Facsimile:    (212) 839-5599
Email:    andres.barajas@sidley.com
weiru.fang@sidley.com

*Proposed Attorneys for the Debtors*
*and Debtors in Possession*

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| In re:<br><br>EBIX, INC., *et al.*[1]<br><br>　　　　　　　Debtors. | Chapter 11<br><br>Case No. 23-80004 (SWE)<br><br>(Joint Administration Requested) |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Ebix, Inc. (1975), Vertex, Incorporated. (6295), P.B. Systems, Inc. (9074), Ebix Consulting, Inc. (6666), Ebix US, LLC (N/A), Facts Services, Inc. (1348), Doctors Exchange, Inc. (N/A), Ebix International LLC (N/A), Agency Solutions.com, LLC d/b/a Health Connect LLC (N/A), ConfirmNet Corporation (2737), A.D.A.M., Inc. (8070), and Ebix Latin America, LLC (N/A).  The Debtors' mailing address is 1 Ebix Way, Johns Creek, Georgia 30097.

**DECLARATION OF PETER D. FITZSIMMONS OF ALIXPARTNERS IN SUPPORT OF THE DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 363 AND 503 (I) AUTHORIZING THE DEBTORS TO IMPLEMENT KEY EMPLOYEE INCENTIVE PROGRAM AND KEY EMPLOYEE RETENTION PLAN AND (II) GRANTING RELATED RELIEF**

Pursuant to 28 U.S.C. § 1746, I, Peter D. Fitzsimmons, do hereby declare, under penalty of perjury, the following to the best of my information, knowledge, and belief:

1. I am a Partner and Managing Director at AlixPartners, an internationally recognized restructuring and turnaround firm with substantial experience in providing financial advisory services and an excellent reputation for its work in large and complex chapter 11 cases on behalf of debtors and creditors throughout the United States. AlixPartners has its principal office at 909 Third Avenue, New York, New York 10022. AlixPartners serves as proposed financial advisor to the Debtors in the above-captioned chapter 11 cases and began working for the Debtors in January 2023.

2. I am authorized to submit this declaration (the "Declaration") on the Debtors' behalf in support of the relief requested in the *Debtors' Motion Pursuant to 11 U.S.C. §§ 363 and 503 Authorizing the Debtors to Implement Key Employee Incentive Program and Key Employee Retention Plan and (II) Granting Related Relief* (the "Motion").

3. Although AlixPartners is being compensated for its work as the financial advisor proposed to be retained by the Debtors, I am not being compensated separately for this Declaration or testimony. Unless otherwise indicated herein, the statements in this Declaration are based on my personal knowledge or my opinion based on my experience, on information that I received from the Debtors' employees and advisors, information that I have received from my colleagues at AlixPartners working directly with me or under my supervision, direction, or control, or on my

review of relevant documents. If I were called to testify, I could and would testify competently as set forth below.

**Professional Background and Qualifications**

4.   AlixPartners is internationally recognized for its skills and experience in providing financial advisory services in large and complex chapter 11 cases. AlixPartners' professionals have provided restructuring or crisis management services in numerous large cases, including recent filings in this and other districts. In addition to AlixPartners' experience and reputation for providing financial advisory services in large, complex chapter 11 cases, since January 2023, AlixPartners has performed significant prepetition work for the Debtors.

5.   I joined AlixPartners initially in 1995 and am based at the principal office located at 909 Third Avenue, New York, New York 10022. I have approximately 25 years of turnaround and financial advisory experience. I have been a Partner and Managing Director at AlixPartners for over 20 years. Immediately prior to re-joining AlixPartners, I was at the private equity firm Tower Three Partners. I have also been a senior executive in the restructuring consulting practice of Ernst & Young.

6.   Throughout my career, I have advised on approximately 50 restructuring projects, which include both in-court and out-of-court deals. Furthermore, I have substantial experience in sale processes in chapter 11 cases in various roles some of which include: advisor and Interim CEO in the out-of-court restructuring of the auto collision repair business Service King, advisor in the Intelsat bankruptcy, CRO of the food distribution business AmeriServe Food Distribution, European CRO of global telecom WorldCom, and CEO of the farm hobbyist business Quality Stores.

7. I also have a BA degree from Harvard College and an MBA from the Tuck School at Dartmouth College.

### AlixPartners' Retention

8. Over the course of AlixPartners' engagement with the Debtors, I have worked closely with the Debtors' senior management and other retained professionals and have become knowledgeable about the Debtors' business and financial affairs. AlixPartners has undertaken significant efforts in reviewing and analyzing the Debtors' businesses, operations, and financial projections. Per our engagement letter with the Debtors, AlixPartners' services include, but are not limited to the following:

   a. assisting the company with the development of contingency planning and financial alternatives;

   b. analyze the company's cash management system and forecasting the company's near-term liquidity requirements; and

   c. working closely with the Company's legal and financial advisors to present materials to various financial stakeholders, including the bank lenders and other creditors

9. During our engagement with the Debtors, AlixPartners determined that, in the event of a possible chapter 11 bankruptcy, the Debtors and the bankruptcy estates would only successfully exit bankruptcy so long as certain key non-executive employees stayed with the Debtors throughout the pendency of these cases. Additionally, AlixPartners determined that incentivizing certain key management employees to stay with the company during this critical juncture would ensure that the value of the Debtors' enterprise will be maximized for the benefit of all stakeholders. Accordingly, AlixPartners began a comparative analysis across the country in similarly situated bankruptcy cases to determine how to best implement a key employee retention program (the "KERP") and a key employee incentive program (the "KEIP").

## KEIP

10. The KEIP provides for incentives to six key members of the Debtors' senior management team (each a "KEIP Participant" and collectively, the "KEIP Participants"). I understand that these participants have played, and will continue to play, a central role in the overall strategy and direction of the Debtors' business enterprise, as well as these chapter 11 cases. The KEIP provides the KEIP Participants with the opportunity to earn cash payments only if certain incentive-based performance goals are achieved over the course of the applicable performance period. The KEIP provides aggregate (for all KEIP Participants) target and maximum opportunities of approximately $2,500,000 and $3,235,000, respectively. At "target" performance levels, the average cost per participant for the KEIP is approximately $416,666.70.

11. The KEIP Participants include (i) two Vice Presidents, (ii) the Chief Technology Officer, (iii) the Corporate Vice President of HR and Finance, (iv) a Senior Vice President, (v) and (v) the Chief Financial Officer of the Debtors.[2] Each KEIP Participant is vital to the Debtors' efforts to meet and exceed challenging performance targets during these chapter 11 cases. I understand that two (2) of the six (6) KEIP Participants may be considered "insiders" pursuant to section 101(31) of the Bankruptcy Code. In addition to their substantial day-to-day responsibilities running a highly complex enterprise, it is my understanding that the KEIP Participants' workloads expanded significantly as the Debtors have transitioned their operations into chapter 11.

12. In my experience, incentive programs are regularly used by similarly situated companies to incentivize the performance of senior executives.

13. The KEIP Participants will be entitled to receive payment based upon the following 2 metrics:

---

[2] Of the six (6) KEIP Participants, it is noted that only two (2) are insiders under the Bankruptcy Code. *See* 11 U.S.C. § 101(31).

  a. <u>Target</u>. The sale of the NA L&A Assets at or above a target of $400 million; or

  b. <u>Max</u>. The repayment of the fully allowed pre-petition secured lender claims, including interest and fees.

14. The KEIP contains the following primary design features:

  a. <u>KEIP Participants</u>. Six (6) of the Debtors' most critical employees, who will play significant roles in optimizing the Debtors' performance in these chapter 11 cases.

  b. <u>Timing</u>. The Debtors intend to make payments to KEIP Participants upon the completion of key asset sales or other debt reduction refinancings or transactions, including, but not limited to, the sale of the NA L&A Assets.

15. In assessing the reasonableness of the KEIP, I worked with my team at to identify fifteen companies of similar revenue and capital structure that have successfully implemented chapter 11 key employee incentive plans. Further, the companies that were established as relevant comparables were also companies that reorganized through chapter 11 partly through the sale of key assets or entire business segments. Thereafter, AlixPartners, together with the Debtors and their legal advisors developed the KEIP for which the average potential target and maximum KEIP payments for the Company fell well-within the range of comparable companies.

16. Based off my experience in the industry and the analysis conducted by AlixPartners, I believe the KEIP as designed is structured to achieve the desired performance, the cost is reasonable, and the scope is fair and reasonable. I believe the implementation of the KEIP is in the best interests of the Debtors and these bankruptcy estates.

### **KERP**

17. The KERP is designed to secure the continued retention of non-management key employees through the effective date of the Debtors' reorganization. The KERP Participants are critical to retain during this process to best ensure the Debtors' uninterrupted operations and successful reorganization. The KERP Participants work across the Debtors' organizational

structure and are responsible for managing a variety of tasks and processes critical to the Debtors' day-to-day operations. Many of the KERP Participants have worked with the Debtors for many years and have extensive institutional knowledge, such that their loss would cause significant disruption to the Debtors' operations and ability to implement a successful restructuring.

18. For purposes of selecting the KERP Participants, the Debtors' executive team, with the assistance of AlixPartners and their other advisors, conducted a multi-step process to identify each of the employees critical to the Debtors' organizational structure and necessary to carry out the day-to-day operations of the Debtors' business. Once these employees were identified, the executive team further evaluated each employee on the basis of "business impact" and retention. Factors specifically considered included: (a) whether an employee has unique or significant knowledge of the Debtors' infrastructure and business, (b) whether the employee's unique skills or experiences would be crucial to the Debtors' operations and reorganization, (c) the anticipated demand for the aforementioned knowledge and skill in the marketplace, and (d) the time, expense and ease of finding an adequate replacement.

19. The KERP provides for payments to the KERP Participants in installments during these chapter 11 cases to ensure the Debtors' successful emergence from these chapter 11 cases. The total amount designated under the DIP Facility budget for the potential KERP payments is $2 million, with the contemplated aggregate pool for the KERP payments being approximately $1.6 million.

20. The key terms of the KERP are:

    a. <u>KERP Participants</u>. Twenty-eight (28) of the Debtors' employees in critical positions within the Debtors' organizational structure and necessary to carry out the day-to-day operations of the Debtors' business.

    b. <u>Plan Pool</u>: The Finance Committee and the Board have approved payment of up to $1.65 million in KERP payments to the twenty-eight KERP Participants in the initial KERP.

  c. <u>Timing</u>. Timing of the KERP payments is an important factor in maximizing the effectiveness of the KERP. The most critical activities for which the Debtors' KERP Participants occur during the first seven months of 2024. Accordingly, the DIP Facility budget allows for payments on: i) March 31, 2024, ii) the earlier of July 31, 2024 or the last day of the employee's employment, as mutually agreed by the company and the employee and iii) the earlier of confirmation of a plan of reorganization in these chapter 11 cases, or the employees' final date of employment with the Debtors.

  d. <u>Termination</u>. If a KERP Participant voluntarily terminates his or her employment prior to the date of the proposed payment of the KERP award, then that Participant's award will be deemed forfeited, and not returned to the pool to be redistributed among the remaining KERP Participants.

21. The KERP was designed by the Debtor's management team, in close collaboration with the Debtor's restructuring and financial advisors, to ensure continued employment of certain non-insider employees whom the Debtors have identified as critical to their continued operation and successful reorganization, all within the parameters of sections 363(b) and 503(c) of the Bankruptcy Code.

22. In order to verify the reasonableness of the KERP, AlixPartners conducted a market analysis of chapter 11 cases in the last six (6) years with similar debt amounts, creating a comparable analysis of nineteen (19) companies that restructured during that time frame. The purpose of this review was to gather data with respect to the design and general construct of various non-insider retention in other chapter 11 cases and disclosed plan costs and KERP opportunities (where available). After this information had been assembled, the KERP was developed to contemplate an aggregate potential payment amount for the initial twenty-eight participants that was well within the range of comparable cases, as measured by KERP payments as a percentage of total outstanding bank debt.

23. Based on my experience in the industry and the work I have done on this matter, it is my opinion that the KERP is consistent with market practice, is reasonable given the facts and circumstances, and is structured to retain those employees necessary to carry out the business

operations of the Debtors. The KERP is a justified and reasonable exercise of the Debtors' business judgment.

## Conclusion

24. Accordingly, for all the foregoing reasons, I believe that the programs set forth in the Motion are justified and beneficial to the success of these bankruptcy cases. I believe that both the KEIP and KERP are reasonable, and appropriate.

*[Remainder of Page Intentionally Left Blank]*

I declare under penalty of perjury that, after reasonable inquiry, the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 18th day of December, 2023

*/s/ Peter D. Fitzsimmons*
By: Peter D. Fitzsimmons
Partner and Managing Director
**AlixPartners**