SIDLEY AUSTIN LLP
Thomas R. Califano (24122825)
Rakhee V. Patel (00797213)
Jeri Leigh Miller (24102176)
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone:     (214) 981-3300
Facsimile:     (214) 981-3400
Email:         tom.califano@sidley.com
               rpatel@sidley.com
               jeri.miller@sidley.com

SIDLEY AUSTIN LLP
Andres Barajas (*pro hac vice* pending)
Weiru Fang (*pro hac vice* pending)
787 Seventh Avenue
New York, New York 10019
Telephone:     (212) 839-5300
Facsimile:     (212) 839-5599
Email:         andres.barajas@sidley.com
               weiru.fang@sidley.com

*Proposed Attorneys for the Debtors*
*and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| EBIX, INC., *et al.*[1] | Case No. 23-80004 (SWE) |
| Debtors. | (Joint Administration Requested) |

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Ebix, Inc. (1975), Vertex, Incorporated (6295), P.B. Systems, Inc. (9074), Ebix Consulting, Inc. (6666), Ebix US, LLC (N/A), Facts Services, Inc. (1348), Doctors Exchange, Inc. (N/A), Ebix International LLC (N/A), Agency Solutions.com, LLC d/b/a Health Connect LLC (N/A), ConfirmNet Corporation (2737), A.D.A.M., Inc. (8070), and Ebix Latin America, LLC. (N/A).   The Debtors' mailing address is 1 Ebix Way, Johns Creek, Georgia 30097.

**DEBTORS' EMERGENCY MOTION
FOR ENTRY OF AN ORDER (I)(A) APPROVING
BID PROCEDURES; (B) APPROVING THE DEBTORS'
ENTRY INTO THE STALKING HORSE APA AND APPROVING
BID PROTECTIONS; (C) SCHEDULING AUCTION AND SALE
HEARING; (D) APPROVING THE FORM AND MANNER OF NOTICES
RELATING TO THE SALE TRANSACTION; (E) APPROVING ASSUMPTION
AND ASSIGNMENT PROCEDURES; (II) AUTHORIZING THE SALE TRANSACTION
AND (III) GRANTING RELATED RELIEF**

---

**Emergency relief has been requested. Relief is requested not later than January 8, 2024.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on Monday, January 8, 2024, at 1:30 p.m. (CT) in Courtroom #3, 14th Floor, 1100 Commerce Street, Dallas, TX 75242-1496. You may participate in the hearing by an audio and video connection only.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at 1-650-479-3207. Video communication will be by the use of the Cisco WebEx platform. Connect via the Cisco WebEx application or click the link on Judge Everett's home page. The meeting code is 476 420 189. Click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of electronic hearings. To make your appearance, click the "Electronic Appearance" link on Judge Everett's home page. Select the case name, complete the required fields and click "Submit" to complete your appearance**

---

Ebix, Inc. and its debtor affiliates as debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases, hereby submit this motion (this "Motion"). In support of this Motion, the Debtors submit the *Declaration of Amit K. Garg, Chief Financial Officer of Ebix, Inc., in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 16] (the "First Day Declaration")[2] and the *Declaration of Richard W. Morgner in Support of Debtors' Emergency Motion for Entry of an Order (I)(A) Approving Bid Procedures; (B) Approving the Debtors' Entry into the Stalking Horse APA and Approving Bid Protections; (C) Scheduling Auction and Sale Hearing; (D) Approving the Form and Manner of Notices Relating to the Sale*

---

[2]  Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the First Day Declaration.

*Transaction; (E) Approving Assumption and Assignment Procedures; (II) Authorizing the Sale Transaction; and (III) Granting Related Relief* (the "Sale Decl."), attached hereto as **Exhibit A**. In further support of this Motion, the Debtors state as follows:

## PRELIMINARY STATEMENT

1.      In accordance with the milestones set forth in the Stalking Horse APA (as defined below) (the "APA Milestones") and as an exhibit to that certain Restructuring Support Agreement (the "RSA") (the "RSA Milestones" and together with the APA Milestones, the "Milestones"), the Debtors are seeking approval of bid procedures designed to maximize value while creating a swift, efficient, and consensual path to confirming a chapter 11 plan.  The proposed sale process is designed to maximize the value of the Debtors' assets while preserving cash for the benefit of the Debtors' estates and its creditors by minimizing administrative costs associated with the chapter 11 process.  To that end, prior to commencing these cases the Debtors and their advisors began a robust marketing process for the sale or disposition of the Debtors' and certain of their subsidiaries' North American Life and Annuity assets (the "NA L&A Assets").  The Debtors intend to additionally market and sell such other assets as are deemed necessary and appropriate by the Debtors under the terms of the RSA (the "Other Assets" and together with the NA L&A Assets, the "Assets"), all in consultation with those lenders that are parties to the RSA.

2.      As contemplated in the RSA, the Debtors have selected Zinnia Distributor Solutions LLC or its designee (together, "Zinnia") to act as the stalking horse purchaser (the "Stalking Horse Purchaser") substantially on the terms agreed upon in the form of Stalking Horse APA (as defined below).  The Stalking Horse APA will be subject to higher and better offers pursuant to the postpetition marketing process described herein.

3.      The Debtors have determined, in the exercise of their business judgment, that the best way to maximize the value of the Assets for all stakeholders is to market-test the Assets

through an auction process and to expeditiously sell the Assets to the highest or otherwise best

bidder.  In light of the robust marketing process completed prepetition, the Debtors respectfully

submit that the postpetition marketing process described herein is sufficient to test whether a

higher or better bid is available for the Assets.

### **RELIEF REQUESTED**

4.      By this Motion, the Debtors seek entry of an order (the "Bid Procedures Order"),

substantially in the form attached hereto as **Exhibit B**, granting, among other things, the following

relief:

> i.      authorizing and approving the proposed bid procedures (the "Bid Procedures"),
> substantially in the form attached to the Bid Procedures Order as Exhibit 1, in
> connection with (a) the sale of the NA L&A Assets through consummation of
> either the Stalking Horse APA or a Successful Bid (each as defined below)
> (the "NA L&A Sale Transaction"), and (b) the sale of the Other Assets through
> consummation of one or more Successful Bids (as defined below) (the "Other
> Sale Transaction(s)," and together with the NA L&A Sale Transactions,
> the "Sale Transactions");

> ii.     authorizing the Debtors' to select Zinnia as the Stalking Horse Purchaser for
> the NA L&A Sale Transaction;

> iii.    authorizing and approving the terms of and the Debtors' entry into an Asset
> Purchase Agreement to be entered into by and among the Debtors and Zinnia
> (as amended, supplemented, or otherwise modified by the parties thereto, and
> including the disclosure schedules and exhibits attached hereto,
> the "Stalking Horse APA" and the bid thereunder the "Stalking Horse Bid"),
> substantially in the form and substance attached to the Bid Procedures Order as
> Exhibit 2, including approval of the bid protections provided for therein
> (the "Bid Protections");

> iv.     scheduling the auction(s) of the Assets (the "Auctions"), if necessary, and
> hearings to consider approval of the Sale Transactions (the "Sale Hearings");

> v.      authorizing and approving the form and manner of notice (the "Sale Notice"),
> substantially in the form attached to the Bid Procedures Order as Exhibit 3, of
> the Sale Transactions, the Auctions, and the Sale Hearings;

> vi.     authorizing and approving the form and manner of notice (the "Potential
> Assumption and Assignment Notice"), substantially in the form attached to the
> Bid Procedures Order as Exhibit 4, to each non-Debtor counterparty

(each, a "Counterparty, and collectively, the "Counterparties") to a relevant executory contract or unexpired lease relating to the Assets (collectively, the "Assigned Contracts") regarding the potential assumption of certain Assigned Contracts and the Debtors' calculation of the amount necessary to cure any monetary defaults under such Assigned Contracts (such amounts, the "Cure Amounts");

vii.    authorizing and approving the form and manner of notice (the "Post-Auction Notice"), substantially in the form attached to the Bid Procedures Order as Exhibit 5, provided following the Auctions, which shall include (a) the highest or otherwise best bid for the relevant Assets (the "Successful Bid," and the bidder submitting the Successful Bid, the "Successful Bidder") and the next-highest or otherwise second-best bid (the "Back-Up Bid," and the bidder submitting the Back-Up Bid, the "Back-Up Bidder") and (b) the respective identity of the Successful Bidder and Back-Up Bidder;

viii.    authorizing and approving the procedures (the "Assumption and Assignment Procedures") for the assumption and assignment of certain Assigned Contracts in connection with the Sale Transactions, as applicable (collectively, the "Designated Contracts"), including the notice of assumption and assignment to the Counterparties to the Designated Contracts, substantially in the form attached to the Bid Procedures Order as Exhibit 6 (the "Notice of Designated Contracts"); and

ix.    granting related relief.

5.    Additionally, the Debtors seek entry of an order (the "Sale Order")[3] granting, among other things, the following relief:

i.    authorizing the NA L&A Sale Transaction to the Stalking Horse Purchaser or the Successful Bidder, as applicable, free and clear of all liens, claims, interests and encumbrances;

ii.    authorizing the assumption and assignment of the Designated Contracts relating to the NA L&A Assets; and

iii.    granting related relief.

---

[3]    The Debtors have filed a form of Sale Order for the sale of the NA L&A Assets contemporaneously herewith as Exhibit B to the Stalking Horse APA.

## JURISDICTION AND VENUE

6.     The United States Bankruptcy Court for the Northern District of Texas (the "Court") has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc* dated August 3, 1984, entered by the United States District Court for the Northern District of Texas.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

7.     The legal predicates for the relief requested herein are sections 105(a), 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6003, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), rule 2002-1 of the Bankruptcy Local Rules for the Northern District of Texas (the "Local Rules"), and section E of the Procedures for Complex Chapter 11 Cases in the Northern District of Texas.

8.     The Debtors confirm their consent to the entry of a final order by the Court in connection with the Motion in the event that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

## BACKGROUND

9.     Ebix, Inc., along with its affiliated debtors and debtors in possession, is a leading international provider of a variety of technology services, focusing on the insurance, financial services, travel, and healthcare industries. The Debtors' main focus is to design and deploy a wide variety of insurance and reinsurance exchanges on an on-demand basis using software-as-a-service enterprise solutions in areas of customer relationship management, front-end and back-end systems, and outsourced administrative and risk compliance.

10.    On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under sections 101–1532 of the Bankruptcy Code in this Court.  Additional information regarding the Debtors' business, capital structure, and the circumstances preceding the Petition Date may be found in the First Day Declaration.

**THE DEBTORS' ASSETS**

11.    The NA L&A Assets constitutes the operations of the Debtors' (i) end-to-end life and annuity exchanges business operating in North America, and (ii) software development and business process outsourcing support services in respect of the foregoing, in each case, as delivered to customers through the following software: TPP/PSS, iHub, EbixHUB, AnnuityNet, LifeSpeed, Winflex, VitalSales Suites, Vertex Product Suite, Vertex-VitalXML, EbixCRM/Smartoffice, Superhighway, Ebix Analytics, Annuity Maintenance Platform, Annuity Case Management, DeliveryNow, Reinsurance Portal, Claims Processor, GeniEbix/Digital Assistants, and Producer Support System (PSS).

12.    The Other Assets constitute the operations of (i) the Debtors' health and wellness and other insurance exchanges business, which offers customers, among other things, continuing medical education, raw claims data automation and sequencing, downloading services, a digital-native risk management and claims administration system, and other support services; (ii) the Debtors' risk compliance solutions business, which offers, among other things, specialized project management, system consulting services, claims adjudication and settlement services, and insurance certificate management software and services; and (iii) such other North American assets as are deemed necessary and appropriate to be sold by the Debtors in accordance with the terms of the RSA.

## PREPETITION MARKETING PROCESS

13.    The Debtors retained Jefferies, LLC ("Jefferies") as their investment banker in 2021 to, among other things, advise the Debtors and facilitate outreach in connection with an evaluation of the Debtors' immediate financing needs and potential strategic transactions, including bridge financing and asset sales.  Sale Decl. ¶ 8.  Jeffries launched a marketing process on behalf of the Debtors to explore capital raise opportunities in an effort to refinance the maturing Prepetition Credit Agreement.[4]  *Id.*  Despite Jefferies' robust marketing process, including engagement with over ninety parties, the Debtors did not ultimately receive any acceptable refinancing offers, and determined to terminate the process.  *Id.*

14.    The Debtors re-engaged Jefferies on November 25, 2022, to provide investment banking services in connection with the effort to refinance the maturing Prepetition Credit Agreement and a potential restructuring of the Debtors.  *Id.* ¶ 9.  A cross-sectional team of six managing directors across Jefferies' leverage finance and debt capital markets, debt advisory and restructuring, and technology groups have been overseeing these efforts.  *Id.*  Jefferies has been integrally involved in the negotiations with existing Prepetition Lenders under the Debtors' Prepetition Credit Agreement, other creditors and stakeholders, and third parties.  *Id.*  In addition, Jefferies, together with the Debtors' other advisors and management, have been assisting the Debtors in (i) the negotiation of a debtor in possession credit facility and assessment of alternative financing options, and (ii) running a comprehensive sale and marketing process for substantially all of the Debtors' assets.  *Id.*

---

[4]    "Prepetition Credit Agreement" means that certain Credit Agreement, dated as of August 5, 2014, as amended, restated, supplemented, or otherwise modified and in effect from time to time, by and among Ebix, as borrower, certain subsidiaries of Ebix, as guarantors, each lender from time to time party thereto (the "Prepetition Lenders"), and Regions Bank, as administrative agent and collateral agent (including any successors thereto, the "Prepetition Agent").

15.    As set forth more fully in the First Day Declaration, the Debtors explored various alternatives toward a refinancing or repayment of the Prepetition Credit Agreement.  One of these paths was a marketing process for the sale of certain of the Debtors' assets, which commenced in February 2023.  *Id.* ¶ 10.  Beginning on March 29, 2023, Jefferies distributed an initial marketing materials package with respect to a sale of the Debtors' North American operations to approximately thirty potential interested buyers.  *Id.*  Management conducted twelve meetings with potential buyers, and provided significant initial diligence.  *Id.*  Nine indications of interest were received in early May 2023.  *Id.*  Based on feedback from the buyers and direction from the Debtors' Strategic Investment Committee (the "<u>SIC</u>"), the Debtors sought revised indications of interest for the NA L&A Assets.  *Id.*  Six parties submitted revised bids, and the SIC selected two bidders to continue forward in the process during the summer and fall of 2023.  *Id.*

16.    In November 2023, the Debtors' newly-constituted finance committee and the Debtors' Board of Directors authorized Jefferies to broaden the marketing process to any and all interested buyers and expand the scope of the potential assets to be sold beyond the NA L&A Assets.  *Id.* ¶ 11.  Subsequently, an additional four parties engaged in exploration of a purchase of the Debtors' Assets, including the Stalking Horse Purchaser (defined and described more fully below).  *Id.*  To date, significant information regarding the Debtors' business has been made available in the virtual data room for potential buyers, which includes more than 450 files comprising more than 25,000 pages of diligence.  *Id.*

## THE BID PROCEDURES

17.    The Debtors request entry of the Bid Procedures attached as <u>Exhibit 1</u> to the Bid Procedures Order.  The Bid Procedures are designed to promote a competitive and expedient sale process and will enable the Debtors to solicit and a identify bids from potential buyers that

constitute the highest and best offer for the Assets, in an efficient manner and on a reasonable timeline.

## I.      The Proposed Sale Timelines for the Assets.[5]

18.      As set forth above, the Debtors engaged in an extensive prepetition marketing process for the NA L&A Assets, which ultimately led to the negotiation of the Stalking Horse APA.    As set forth therein, the Stalking Horse APA contains certain APA Milestones, meant to promote an expedient postpetition marketing and sale timeline to maximize the value of such NA L&A Assets for the benefit of the Debtors estates.  *See id.* ¶ 15. Accordingly, the proposed Bid Procedures provide the following timeline for the marketing and bid process for the NA L&A Sale Transaction:

| *NA L&A Sale Transaction Milestones* | |
| --- | --- |
| **Date and Time** (all in prevailing Central Time) | **Event or Deadline** |
| January 8, 2024, at TBD | Hearing on Approval of the Bid Procedures |
| January 10, 2024 | Deadline to Provide Notice of Potential Assumption and Assignment |
| January 29, 2024, at 4:00 p.m. | Bid Deadline |
| January 31, 2024 | Determination of Qualified Bids |
| January 31, 2024, at 4:00 p.m. | Deadline to File Objections to Cure Amount |
| February 2, 2024 at TBD | Auction |
| February 2, 2024 | Deadline to Serve Post-Auction Notices |
| February 5, 2024, at 4:00 p.m. | Deadline to File Objection to Sale or Assumption and Assignment |
| February 6, 2024 | Deadline to File Reply to Objections |
| February 7, 2024, at TBD | Sale Hearing |

19.      Simultaneous to the sale of the NA L&A Assets, the Debtors intend to engage in the postpetition marketing and sale of the Other Assets.  The RSA Milestones require a prompt schedule for the sale of the Other Assets, which is meant to generate value for the benefit of the Debtors' creditors and other stakeholders.  *Id.*  Accordingly, the proposed Bid Procedures provide the following timeline for the marketing and bid process for the Other Sale Transaction(s):

---

[5]      The Debtors, subject to the RSA and in consultation with the Consultation Parties (as defined in the Bid Procedures), reserve the right to extend any of the deadlines in these Bid Procedures.

| Other Sale Transaction Milestones | |
|---|---|
| **Date and Time**<br>(all in prevailing Central Time) | **Event or Deadline** |
| January 8, 2024, at TBD | Hearing on Approval of the Bid Procedures |
| January 10, 2024 | Deadline to Provide Notice of Potential Assumption and Assignment |
| January 31, 2024, at 4:00 p.m. | Deadline to File Objections to Cure Amount |
| March 29, 2024, at 4:00 p.m. | Bid Deadline |
| April 4, 2024 | Determination of Qualified Bids |
| April 9, 2024, at TBD | Auction |
| April 10, 2024 | Deadline to Serve Post-Auction Notices |
| April 12, 2024, at 4:00 p.m. | Deadline to File Objection to Sale or Assumption and Assignment |
| April 17, 2024 | Deadline to File Reply to Objections |
| April 18, 2024, at TBD | Sale Hearing |

20.     In formulating the proposed sale timelines, the Debtors balanced the need to sell the Assets quickly and efficiently against the need to provide adequate time for potential purchasers to conduct due diligence and submit bids.  *See id.* ¶ 14.  The approximately four month postpetition marketing and bid process strikes an appropriate balance under the facts that exist here, including that the Debtors have previously marketed the Assets, that the Debtors' Prepetition Lenders support the expedited process, as seen in the RSA Milestones, and that the Debtors have a framework within which to structure the purchase of the NA L&A Assets in the form of the Stalking Horse APA.  *Id.* ¶ 15.

**II.     The Bid Procedures.**

21.     The Bid Procedures, attached as <u>Exhibit 1</u> to the Bid Procedures Order, set forth an orderly process that should foster a competitive bidding and auction process in a fair and transparent manner.  *See id.* ¶ 13.  The proposed Bid Procedures provide for appropriate requirements to submit a Qualified Bid (as defined in the Bid Procedures) and provide potential bidders with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.  *Id.*  If the Debtors receive two or more Qualified Bids with respect to the Assets, the proposed Bid Procedures contemplate an open Auction process that

will increase the likelihood that the Debtors will obtain the highest or otherwise best value for the

Assets to the benefit of the Debtors' estates.  *Id.*

22.      The key provisions of the Bid Procedures, which will be approved in the Bid

Procedures Order, are summarized in the following table:[6]

| Key Provisions of Bid Procedures | |
|---|---|
| **Provisions Governing Qualification of Bidders**<br><br>**(Sections III & IX)** | To participate in the bid process, each potential bidder (other than the Stalking Horse Purchaser) must deliver or have previously delivered to the Debtors the following preliminary documentation:<br>• an executed confidentiality agreement in the form attached as Schedule 1 to the Bid Procedures;<br>• sufficient information to demonstrate the potential bidder's financial wherewithal to consummate a sale;<br>• sufficient information to determine whether the potential bidder has the ability to obtain all necessary regulatory and other governmental approvals;<br>• identity of the potential bidder, as well as a description of the nature and extent of diligence the potential bidder wishes to conduct; and<br>• sufficient information that the potential bidder intends to access the Debtors' data room for purposes consistent with the Bid Procedures.<br>In addition, the Debtors reserve the right to require potential bidders to submit written indications of interest prior to the bid deadline, specifying, among other things, the Assets proposed to be acquired, the amount and type of consideration to be offered, and any other material terms to be included in a bid by such party. |
| **Provisions Governing Qualified Bids**<br><br>**(Section VIII)** | To participate in the Auction, a bidder (other than the Stalking Horse Purchaser) must deliver to the Debtors and their advisors an irrevocable offer for the purchase of the Assets by, (i) in the case of the NA L&A Assets, January 29, 2024, and (ii) in the case of the Other Assets, March 29, 2024, which meets the bid requirements set forth in Section VIII of the Bid Procedures.<br><br>Each bid must list, among other things, the Assets to be included or excluded from the Sale Transaction and must be accompanied by an executed purchase agreement.  In the case of the NA L&A Sale Transaction, each bid must also be accompanied by a redline to the Stalking Horse APA.  In addition, each bid must be accompanied by proof of a bidder's financial ability to perform and a good faith deposit equal to 10% of the aggregate purchase price. |
| **Bid Protections**<br><br>**(Recitals, Section XII.B)** | The Debtors seek authority through this Motion to provide the Stalking Horse Purchaser with certain bid protections, including:<br>• a breakup fee equal to 3% of the base purchase price (*i.e.* $20,000,000);<br>• reimbursement of the Stalking Horse Purchaser's actual, reasonable, documented, out-of-pocket costs and expenses up to a maximum amount of $3 million; and |

---

[6]     The following summary is provided for convenience purposes only.  To the extent any of the terms below are inconsistent with the Bid Procedures Order, the Bid Procedures Order shall control in all respects.

| Key Provisions of Bid Procedures | |
|---|---|
| | • the requirement that each Qualified Bid (as defined in the Bid Procedures) provide for an amount of consideration that equals at least the sum of (i) the amount of the purchase price consideration set forth in the Stalking Horse APA; (ii) the total bid protections of $15,000,000; and (iii) an overbid amount of $5,000,000. |
| **Modification of Bidding and Auction Procedures** <br><br> **(Sections XII.A & XVIII)** | The Debtors may announce at the Auction modified or additional procedures for conducting the Auction or otherwise modify the Bid Procedures. <br><br> The Debtors shall also be entitled to modify the Bid Procedures, in their business judgment and in consultation with the Consenting Lenders (as defined in the Bid Procedures) in any manner that will best promote the goals of the Bid Procedures; *provided* that any modifications shall not be inconsistent with the Stalking Horse APA or the Bid Procedures Order. |
| **Designation of Back-Up Bidder** <br><br> **(Section XIII)** | The Debtors shall designate a Back-Up Bidder at the Auction. If for any reason the Successful Bidder fails to consummate the Sale Transaction within the time permitted by the order approving the sale, then the Back-Up Bidder will automatically be deemed to have submitted the highest or otherwise best bid, and the Debtors will be authorized, but not required, to consummate the Sale Transaction with the Back-Up Bidder as soon as is commercially reasonable and without further order of the Court upon at least 24 hours advance notice, which notice will be filed with the Court. |
| **Provisions Governing Auction** <br><br> **(Section XII)** | In the case of the NA L&A Sale Transaction, the Debtors shall conduct an Auction on February 2, 2024. In the case of the Other Sale Transaction(s), the Debtors shall conduct an Auction on April 9, 2024. Qualified Bidders (as defined in the Bid Procedures) will be notified of the time and place of the Auctions in advance thereof. Each Qualified Bidder participating in the Auction will be required to confirm on the record that it has not engaged in any collusion. |

## THE STALKING HORSE APA AND BID PROTECTIONS

23.      Following arms'-length and good faith negotiations, the Debtors and the Stalking Horse Purchaser have agreed in principle upon the Stalking Horse APA, whereby the Stalking Horse Purchaser will purchase the NA L&A Assets.  *See id.* ¶ 17.  The Debtors submit that the Stalking Horse APA promotes competitive bidding and maximizes of the value of the NA L&A Assets by establishing a baseline bid for the NA L&A Assets, which is subject to higher or otherwise better offers at the Auction.  *Id.* ¶¶ 17–18.

24.      The material terms of the Stalking Horse APA are summarized in the following table:[7]

---

[7]      The following summary is provided for convenience purposes only.  All capitalized terms that are used in this summary but not otherwise defined herein shall have the meanings ascribed to such terms in the Stalking Horse

| Summary of Stalking Horse APA | |
|---|---|
| **Parties** | The Stalking Horse APA is entered into by and between Zinnia Distributor Solutions LLC (the "Stalking Horse Purchaser") and Ebix, Inc. (the "Seller"). |
| **Purchase Price**<br><br>(Stalking Horse APA, Section 2.1) | $400 million, subject to an upward or downward purchase price adjustment based on (i) EBITDA for the NA L&A Business as reflected in a forthcoming quality of earnings report with a $55.0 million target (subject to a collar), (ii) to be determined normalized level of working capital for the NA L&A Business, and (iii) deferred revenue for the NA L&A Business. |
| **Purchased Assets / Assumed Liabilities**<br><br>(Stalking Horse APA, Sections 2.1 & 2.3) | The assets to be included are all of the rights, title, and interests in, to and under the assets and interests of the Seller Group that are primarily used or held for use in connection with the NA L&A Asset Business (other than the specified Excluded Assets), including agreed upon working capital assets of the NA L&A Business.  The Stalking Horse Purchaser will assume the liabilities related to the Assigned Contracts, the Transferred Employees, and agreed upon working capital liabilities of the NA L&A Business. |
| **Bid Protections**<br><br>(Stalking Horse APA, Definitions & Sections 9.1 & 9.3) | The Stalking Horse APA includes a 3% Breakup Fee and a $3.0 million documented Purchaser Expense Reimbursement.  There are several triggers for payment of the Breakup Fee based on various termination events, including triggers for:<br><br>• failure to close by the Outside Date, which is four months following the signing of the Stalking Horse APA (other than as a result of a party's breach or inaccuracy of a covenant, representation or warranty set forth in the Stalking Horse APA);<br><br>• failure to meet the APA Milestones;<br><br>• the Debtors consummating or entering into a definitive agreement with respect to an Alternative Transaction;<br><br>• the Debtors withdrawing this Motion or upon the dismissal or conversion of the chapter 11 cases; or<br><br>• certain breaches of the covenants, representations, or warranties set forth in the Stalking Horse APA. |
| **Good Faith Deposit**<br><br>(Stalking Horse APA, Section 1.1) | The Stalking Horse APA defines the good faith deposit as the "Deposit Escrow Amount," which is set at 2.5% of the Base Purchase Price.<br><br>The distribution of the Deposit Escrow Amount shall be in accordance with the terms of Section 2.9(c), which sets forth the conditions under which the good faith deposit shall be returned to the Stalking Horse Purchaser or released to the Debtors. |
| **Sell Free and Clear**<br><br>(Stalking Horse APA, Sections 3.7 and 3.14) | The Stalking Horse APA provides that the Stalking Horse Purchaser's purchase of the NA L&A Assets shall be free and clear of all Liens (other than Permitted Liens and specified Assumed Liabilities) to the maximum extent permitted by applicable law, including section 363(f) of the Bankruptcy Code. |
| **Closing Conditions and Other Milestones**<br><br>(Stalking Horse APA, Sections 8.2 & 9.1) | The Stalking Horse APA sets forth certain milestones, which if not satisfied, eliminate the Stalking Horse Purchaser's obligation to close under the Stalking Horse APA.  Those APA Milestones require:<br><br>• the filing of this Motion by no later than 1 Business Day following the Petition Date; |

APA attached to the Bid Procedures Order as Exhibit 2.  To the extent any of the terms below are inconsistent with the Stalking Horse APA, the Stalking Horse APA shall control in all respects.

| Summary of Stalking Horse APA | |
|---|---|
| | • the entry of the Bid Procedures Order on or before the date that is 23 days following the Petition Date; <br><br> • the commencement and conclusion of an Auction for the NA L&A Assets on or before a date that is 47 days following the Petition Date; <br><br> • the entry of an order approving the NA L&A Sale Transaction on or before a date that is 52 days following the Petition Date; and <br><br> • an Outside Date that is approximately 4 months following the date of signing the Stalking Horse APA. <br><br> In addition, the Stalking Horse APA contains certain conditions to the obligations of the Stalking Horse Purchaser, including: <br><br> • the acceptance of an employment offer with the Stalking Horse Purchaser by the Key Employees and at least 50% of the employees scheduled on Schedule 8.2(e)(ii); <br><br> • final determination of EBITDA of at least $39.875 million as part of the forthcoming quality of earnings report; and <br><br> • other customary closing conditions, such as approval under the HSR Act, accuracy of the representations and warranties, no material adverse effect, and delivery of customary closing deliverables. |
| **Transferred Employees** <br><br> (Stalking Horse APA, Section 8.2(e)) | The Stalking Horse APA provides as a condition to closing that (i) each Key Employee; and (ii) at least 50% of the employees set forth on Schedule 8.2(e)(ii) shall have accepted an employment offer with the Stalking Horse Purchaser or an Affiliate by no later than five Business Days prior to Closing (to become effective as of the Closing). |
| **Releases, Exculpations, and Indemnifications** <br><br> (Stalking Horse APA, Section 10.16) | The Stalking Horse APA provides for a mutual general release of Purchaser and Seller claims upon Closing. |
| **Record Retention** <br><br> (Stalking Horse APA, Section 7.1) | The Seller Group shall have reasonable access to transferred books and records for a period of seven years after Closing. |
| **Successor Liability** <br><br> (Stalking Horse APA, Exhibit B) | The form of order approving the NA L&A Sale Transaction that is attached to the Stalking Horse APA provides in paragraphs S., V., and 14 that the Stalking Horse Purchaser expressly negotiated for the protection of obtaining the NA L&A Assets free and clear of all Interests (as such term is defined in the form of order approving the NA L&A Sale Transaction), including, without limitation, any potential successor liability (and other than Permitted Liens). |
| **Relief from Bankruptcy Rule 6004(h)** <br><br> (Stalking Horse APA, Exhibit B) | The form of order approving the NA L&A Sale Transaction that is attached to the Stalking Horse APA provides in paragraph 31 that the order shall be effective and enforceable immediately upon entry and shall not be subject to stay provisions contained in Bankruptcy Rules 6004(h) and 6004(d). |

25.     As set forth above, the Stalking Horse APA contains certain key provisions, each of which were specifically negotiated for by the Stalking Horse Purchaser and which are a condition required by the Stalking Horse Purchaser for the deal.  The Stalking Horse APA contains (a) a provision for reimbursement of reasonable and documented fees and expenses of the Stalking Horse Purchaser not to exceed $3,000,000 (the "Purchaser Expense Reimbursement") following the termination of the Stalking Horse APA under certain circumstances, and (b) a breakup fee equal to 3% of the purchase price (the "Breakup Fee," and together with the Purchaser Expense Reimbursement, the "Bid Protections"), payable in the event that the Stalking Horse APA is terminated under certain circumstances or the Debtors consummate an Alternative Transaction (as defined in the Stalking Horse APA).  *See* Sale Decl. ¶ 18.  Based on the marketing process and arms'-length negotiations between the Debtors and the Stalking Horse Purchaser, the Debtors determined that the key provisions set forth above, including the Bid Protections, were necessary to secure the Stalking Horse Purchaser's commitment to the consummation of the NA L&A Sale Transaction according to the terms of the Stalking Horse APA.  *Id.*  Further, the payment of the Bid Protections will not diminish the Debtors' estates as any Alternative Transaction (as defined in the Stalking Horse APA) or competing bid must exceed the bid set forth in the Stalking Horse APA by an amount that exceeds the sum of the Breakup Fee and Purchaser Expense Reimbursement by at least $5,000,000, increasing the ultimate value of the sale to the benefit of the Debtors' stakeholders and parties in interest.  *See id.*

26.     The Debtors submit that the terms set forth above and in the Stalking Horse APA are the result of extensive, good-faith, arms'-length negotiations, and the Stalking Horse APA is currently the highest and best proposal.  *See id.* ¶ 20.  Accordingly, the Debtors' proposed entry

into the Stalking Horse APA for the NA L&A Assets is in the best interest of the Debtors' estates, constitutes a sound exercise of the Debtors' business judgment, and should be approved. *Id.* ¶ 21.

## NOTICING PROCEDURES

27.     The Debtors request that the Court approve the form and manner of service for the Sale Notice, the Potential Assumption and Assignment Notice, the Notice of Designated Contracts, and the Post-Auction Notice (collectively, the "Notices"), each as attached to the proposed Bid Procedures Order.  The Debtors submit that service of the Notices as set forth below (the "Noticing Procedures") is proper and sufficient to provide notice of the Auction(s), the deadlines to object to the Sale Transaction(s) (the "Sale Objection Deadline(s)"), the deadlines to object to Cure Amounts (the "Cure Objection Deadline"), the deadlines to object to the assumption and assignment of the Designated Contracts (the "Contract Objection Deadline(s)"), and the Sale Hearings to all known and unknown parties.

28.     The Debtors propose that within seven (7) days of the entry of the Bid Procedures Order, the Debtors shall file on the docket and serve the Sale Notice, the Bid Procedures Order and the Bid Procedures, by first-class mail, postage prepaid, provided, upon the following parties (collectively, the "Notice Parties"): (a) the Office of the United States Trustee; (b) the holders of the thirty (30) largest unsecured claims against the Debtors; (c) counsel to the lenders under the Prepetition Loans; (d) the Official Committee of Unsecured Creditors, if any; (e) the United States Attorney's Office for the Northern District of Texas; (f) the Internal Revenue Service; (g) all entities that have, to the best knowledge of the Debtors' management and advisors, expressed written interest in consummating the Sale Transaction within the past six (6) months; (h) all other entities known to have asserted any lien, claim, interest, or encumbrance in or upon any of the Assets; and  (i) all  parties  entitled  to  notice  pursuant  to  Bankruptcy  Rule  2002  and

Local Rule 2002-1; *provided* that to the extent email addresses are available for any of the foregoing parties, such parties may be served by email.

29.     The Debtors shall file the Potential Assumption and Assignment Notice with the Court, post it on the case website at https://omniagentsolutions.com/Ebix, and serve it on each Counterparty to an Assigned Contract that may be a Designated Contract on or before January 10, 2024.   The Debtors shall file the applicable Post-Auction Notice and Notice of Designated Contracts and serve such notices on the counterparties to the applicable Designated Contracts, the Sale Notice Parties, and all parties entitled to notice pursuant to Bankruptcy Rule 2002 and Local Rule 2002-1 via ECF, by email, fax, or overnight delivery, as soon as practicable following the Auction, if any, and in no event later (i) in the case of the NA L&A Assets, February 2, 2024, and (ii) in the case of the Other Assets, April 10, 2024.   Finally, the Debtors shall also cause each of the Notices be posted on their case website at https://omniagentsolutions.com/Ebix.

<u>**THE ASSUMPTION AND ASSIGNMENT PROCEDURES**</u>

30.     The Debtors also request that the Court approve the form of the Potential Assumption and Assignment Notice and Notice of Designated Contracts, each as attached to the Bid Procedures Order and the Assumption and Assignment Procedures described below. The Debtors submit that service of the Potential Assumption and Assignment Notice on the applicable Counterparties is proper and sufficient to provide notice to the Counterparties of the Assumption and Assignment Procedures and the proposed Cure cost associated with their contract(s).

31.     To facilitate the Sale Transactions, the Debtors seek authority to assume and assign the applicable Designated Contracts to the Successful Bidder in accordance with the following Assumption and Assignment Procedures:

(a)     the Debtors shall file with the Court, post on the case website at https://omniagentsolutions.com/Ebix, and serve on each Counterparty to a Assigned Contract an Potential Assumption and Assignment Notice on or prior to January 10, 2024 (the "<u>Potential Assumption and Assignment Notice Deadline</u>").

(b)     The Potential Assumption and Assignment Notice shall include, without limitation: (i) a list of applicable Assigned Contracts that may be Designated Contracts; and (ii) the Cure Amounts, if any, that the Debtors believe is required to be paid. If a Counterparty objects to the Cure Amounts, the Counterparty must file with the Court and serve on each of (A) counsel to the Debtors, (B) counsel to the Creditors' Committee, if any, and (C) the U.S. Trustee (the a written objection (a "<u>Cure Objection</u>") on or before **January 31, 2024 at 4:00 p.m. (prevailing Central Time)**, provided that with respect to any Cure Objection for any Assigned Contract included on any subsequent Potential Assumption and Assignment Notice filed by the Debtors, if any, such Cure Objections must be filed on or prior to the Contract Objection Deadline. Any Cure Objection must (i) be in writing; (ii) comply with the Bankruptcy Rules and Local Rules; (iii) be filed via ECF on or before the Cure Objection Deadline; and (iv) state with specificity the grounds for such objection, including, without limitation, the fully liquidated cure amount and the legal and factual bases for any unliquidated cure amount that the Counterparty believes is required to be paid under Bankruptcy Code sections 365(b)(1)(A) and (B) for the applicable Designated Contract, along with the specific nature and dates of any alleged defaults, the pecuniary losses, if any, resulting therefrom, and the conditions giving rise thereto.

(c)     If, after the Potential Assumption and Assignment Notice Deadline, additional executory contracts or unexpired leases of the Debtors are determined to be potential Designated Contracts in connection with the Sale Transaction, or the Debtors seek to modify the previously stated Cure Amount associated with any Assigned Contract, the Debtors shall file with the Court and serve, by overnight delivery, on the applicable Counterparties a supplemental or amended Potential Assumption and Assignment Notice, and such Counterparties shall file any objection to Cure Amount by the later of (i) the Cure Objection Deadline, or (ii) fourteen days following service of the supplemental or amended Potential Assumption and Assignment Notice.

(d)     Following the Auction, if any, the Debtors shall file with the Court and serve, by overnight delivery, on the applicable Counterparties (i) a Notice of Designated Contracts, and (ii) a Post-Auction Notice, as soon as practicable and in no event later than, (A) in the case of the NA L&A Assets, February 2, 2024, and (B) in the case of the Other Assets, April 10, 2024.

(e)     Any time after the date of service of the Notice of Designated Contracts and prior to the Sale Hearing, the Debtors reserve the right, and are authorized but not directed, to:  (i) add previously omitted Designated Contracts as contracts to be assumed and assigned to the Successful Bidder in accordance with the definitive agreement for the Sale Transaction; (ii) remove a Designated Contract from the Notice of Designated Contract that the Successful Bidder proposes be assumed and assigned to it in connection with the Sale Transaction; or (iii) modify the previously stated Cure Amount associated with any Designated Contract.

(f)     The Counterparties shall file any objections to the assumption and assignment of their contract or adequate assurance of future performance by the Successful Bidder (an "Assignment Objection"), on or prior to the Contract Objection Deadline of (i) in the case of the NA L&A Assets **February 5**, **2024 at 4:00 p.m. (prevailing Central Time)**, and (ii) in the case of the Other Assets, **April 12, 2024 at 4:00 p.m. (prevailing Central Time)**.  Unless otherwise provided, any Assignment Objection must (i) be in writing; (ii) comply with the Bankruptcy Rules and Local Rules; (iii) be filed via ECF on or before the Contract Objection Deadline; and (iv) state with specificity the grounds for such objection, including, without limitation, basis for objecting to the assumption and assignment of the applicable Assigned Contract, adequate assurance of future performance, along with the specific nature and dates of any alleged defaults, the pecuniary losses, if any, resulting therefrom, and the conditions giving rise thereto.

(g)     At the Sale Hearing, the Debtors will seek Court approval of the assumption and assignment to the Successful Bidder of those Designated Contracts that have been selected by the Successful Bidder to be assumed and assigned. The Debtors and their estates reserve any and all rights with respect to any Designated Contracts that are not ultimately designated.

(h)     If no Contract Objection is timely filed with respect to a Designated Contract:  (i) the Counterparty to such Designated Contract shall be deemed to have consented to the assumption by the Debtors and assignment to the Successful Bidder of the Designated Contract, and be forever barred from asserting any objection with regard to such assumption and assignment (including, without limitation, with respect to adequate assurance of future performance by the Successful Bidder); (ii) any and all defaults under the Designated Contract and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to Bankruptcy Code section 365(b)(1)(A) and (B) upon payment of the Cure Amount set forth in the applicable Notice of Designated Contracts for such Designated Contract; and (iii) the Counterparty shall be forever barred from asserting any other claims related to such Designated Contract against the Debtors and their estates or the Successful Bidder, or the property of any of them,

that existed prior to the entry of the order resolving the Contract Objections and the applicable order approving the sale.

(i)    To the extent that the parties are unable to consensually resolve any Contract Objection prior to the commencement of the Sale Hearing, including, without limitation, any dispute with respect to the Cure Amount required to be paid to the applicable Counterparty under Bankruptcy Code sections 365(b)(1)(A) and (B) (any such dispute, a "Cure Dispute"), the Debtors may (i) assume the applicable Assigned Contract prior to the resolution of the Cure Dispute; provided that the Debtors shall (A) pay to the applicable Counterparty the undisputed portion of the Cure Amount within five (5) business days after entry of the applicable order approving the sale and (B) reserve cash in an amount sufficient to pay the disputed portion of the Cure Amount reasonably asserted by the applicable Counterparty (or such lesser amount as may be fixed or estimated by the Court or otherwise agreed to by the Counterparty and the Debtors) (the "Reserve Amount"), or (ii) adjourn their request to assume the Assigned Contract pending resolution of the Cure Dispute (an "Adjourned Cure Dispute"); provided further that, to the extent the Adjourned Cure Dispute is resolved or determined unfavorably to the Debtors, the Debtors may withdraw the proposed assumption of the applicable Assigned Contract after such determination by filing a notice of withdrawal, which, in the case of a lease, shall be prior to the expiration of the applicable deadline to assume or reject unexpired leases under section 365(d)(4) of the Bankruptcy Code. The Debtors shall file notice of their intention to reserve for a Cure Amount or to adjourn their request for assumption. An Adjourned Cure Dispute may be resolved after the closing date of the Sale Transaction in the Debtors' discretion.

## BASIS FOR RELIEF REQUESTED

### I.    The Proposed Bid Procedures Should be Approved.

32.    The Court should approve of the Bid Procedures because they will enable the Debtors to maximize the proceeds received for the Assets. A debtor has a fiduciary duty to maximize the proceeds received by the estate in section 363 sales. *See Cadle Co. v. Mims (In re Moore)*, 608 F.3d 253, 263 (5th Cir. 2010). Bid procedures providing for a court-approved auction process allow a debtor to accomplish its duty of maximizing value by selling assets through exposure to the market. *See also In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL

1820326, at *4 (Bankr. D. Del. 2001) ("[T]he auction procedure has developed over the years as an effective means for producing an arms' length fair value transaction . . . .").

33.     Bankruptcy courts evaluate whether to approve proposed bid procedures under the business judgment standard. *See*, *e.g*., *In re Redwine Res.*, 2010 WL 5209287 at *2 (Bankr. N.D. Tex., June 24, 2010) (approving the debtor's proposed bid procedures where finding the debtors "have exercised sound business judgment and presented sound business reasons"); *In re Integrated Res., Inc*., 147 B.R. 650, 656–57 (S.D.N.Y. 1992) (noting that overbid procedures and breakup fee arrangements that have been negotiated by a debtor are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid").  Here, the Debtors have determined in their business judgment that the proposed Bid Procedures should enable them to elicit the highest or otherwise best offers available for the Assets by, among other things, (i) providing potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid; (ii) providing appropriate requirements for bids to constitute a Qualified Bid (as defined in the Bid Procedures), and (iii) providing for a transparent Auction process to promote competitive bidding from interested parties. *See* Sale Decl. ¶¶ 13-15.  Accordingly, the Court should approve the Bid Procedures.

## II.     The Court Should Authorize Entry Into the Stalking Horse APA and Approve the Bid Protections.

34.     The Court should approve the proposed Bid Protections.   Courts have acknowledged that the approval of breakup fees and expenses in connection with substantial sales in bankruptcy is warranted to compensate an unsuccessful acquirer whose initial offer served as the basis and catalyst for higher or better offers. *See In re ASARCO, L.L.C*, 650 F.3d 593, 602 n.9 (5th Cir. 2011).  The Fifth Circuit requires that breakup fees and expenses be supported by a sound

business justification.  *See id.* at 602–03 (favoring business judgment standard governing use of assets outside of the ordinary course of business in assessing propriety of fees and expenses incurred by bidders).

35.     Here, the proposed Bid Protections are supported by a sound business justification. First, agreement on the Breakup Fee and Purchaser Expense Reimbursement was necessary conditions to entry into the Stalking Horse APA and is not anticipated to chill bidding.  *See* Sale Decl. ¶¶ 18–20.  Second, because the Stalking Horse APA sets a floor for the value of the NA L&A Assets, potential buyers will be encouraged to submit competing bid for the NA L&A Assets, thereby maximizing the realizable value of such assets for the benefit of the Debtors' estates, stakeholders, and other parties-in-interest.  *Id.* ¶ 18.  Without the Breakup Fee and the Purchaser Expense Reimbursement, the Debtors might lose the opportunity to obtain the highest and best offer for the NA L&A Assets and would certainly lose the downside protection that will be afforded by the existence of the Stalking Horse APA.  *See id.*  Third, the Bid Procedures require that any competing bid must exceed the Stalking Horse Bid by an amount in excess of the Breakup Fee and Purchaser Expense Reimbursement, and therefore, the payment of the Bid Protections will not diminish the Debtors' estates to the extent they become payable in an Alternative Transaction (as defined in the Stalking Horse APA).  *Id.*  Finally, the Debtors worked to minimize the amount and circumstances in which the Bid Protections would be payable, and the Bid Protections, as a whole, are comparable to the bid protections often provided to similar bidders in other bankruptcy cases.  *Id*. ¶ 19.  For the foregoing reasons, the Debtors submit that the Breakup Fee and the Purchaser Expense Reimbursement reflect a sound business purpose and request that the Court approve the Bid Protections.

III.    **The Form and Manner of the Noticing Procedures Should Be Approved.**

36.    Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide their creditors with 21 days' notice of the Sale Hearing.  Fed. R. Bankr. P. 2002(a).  Pursuant to Bankruptcy Rules 2002(c)(1), such notice must include the time and place of the applicable auction and sale hearing and the deadline for filing any objections to the relief requested herein.  Fed. R. Bankr. P. 2002(c).  The Debtors submit that notice of this Motion and the related hearing to consider entry of the Bid Procedures Order, together with the service of the (i) Sale Notice, (ii) the Potential Assumption and Assignment Notice, (iii) the Notice of Designated Contracts, and (iv) the Post-Auction Notice as provided for herein, constitutes good and adequate notice of the Auctions, the Sale Hearings, and the proceedings with respect thereto in compliance with, and in satisfactions of, the applicable requirements of Bankruptcy Rule 2002.

IV.    **The Assumption and Assignment Procedures Should Be Approved.**

37.    The Assumption and Assignment Procedures provide a reasonable process by which (i) the Debtors and the Counterparties can reconcile cure obligations, if any, in accordance with section 365 of the Bankruptcy Code, and (ii) such Counterparties can object to the assumption and assignment of the Designated Contracts and any applicable Cure Amounts.  Further, the Assumption and Assignment Procedures provide sufficient notice to the Counterparties to the Designated Contracts regarding the potential assumption and assignment of the Designated Contracts, and provide certainty to all parties-in-interest regarding their obligations and rights in respect thereof.  Finally, it is appropriate for the Assumption and Assignment Procedures to provide that any Counterparty who fails to object to the proposed assumption and assignment of any Designated Contract be deemed to consent to the assumption and assignment of the such Designated Contract pursuant to section 365 of the Bankruptcy Code and on the terms set forth in the order approving the sale.  *See*, *e.g.*, *Hargrave v. Twp. of Pemberton (In re Tabone, Inc.)*, 175

B.R. 855, 858 (Bankr. D.N.J. 1994) (finding that by not objecting to sale motion, creditor was deemed to consent); *Pelican Homestead v. Wooten (In re Gabel)*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).  Accordingly, the Debtors request that the Court approve the Assumption and Assignment Procedures.

**V.     The NA L&A Sale Transaction Is An Exercise of Sound Business Judgment And Should Be Approved.**

38.     Section 363 of the Bankruptcy Code authorizes a debtor to sell assets of the estate other than in the ordinary course of business and provides, in relevant part:  "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate . . . ."  11 U.S.C. § 363(b)(1).

39.     Courts approve proposed sales of property pursuant to section 363 of the Bankruptcy Code if the transaction represents the reasonable business judgment of the debtor. *See Inst. Creditors of Cont'l. Air Lines, Inc. v. Cont'l. Air Lines, Inc. (In re Cont'l. Air Lines)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty . . . there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *In re Moore*, 608 F.3d at 263 ("A sale of assets under [section] 363 . . . is subject to court approval and must be supported by an articulated business justification, good business judgment, or sound business reasons."); *In re Delaware & Hudson Rv. Co*., 124 B.R. 169, 176 (D. Del. 1991) (holding that a court must be satisfied that there is a "sound business reason" justifying the preconfirmation sale of assets); *In re Phoenix Steel Corp*., 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that the elements necessary for approval of a section 363 sale in a Chapter 11 case are "that the proposed sale is fair and equitable, that there is a good business reason for completing the sale and the transaction is in good faith"); *see*

*also Comm. of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063

(2d Cir. 1983); *Stephens Indus. Inc. v. McClung*, 789 F.2d 386, 391 (6th Cir. 1986).

40.     If a valid business justification exists for the sale, as it does in these chapter 11

cases, a debtor's decision to sell property out of the ordinary course of business enjoys a strong

presumption "that in making a business decision the directors of a corporation acted on an

informed basis, in good faith and in an honest belief that the action taken was in the best interests

of the company." *In re Integrated Res., Inc.*, 147 B.R. at 656 (quoting *Smith v. Van Gorkom*, 488

A.2d 858, 872 (Del. 1985)); *see also In re ASARCO, L.L.C.*, 650 F.3d at 601 ("The business

judgment standard in section 363 is flexible and encourages discretion."); *GBL Holding Co.v.

Blackburn/Travis/Cole, Ltd.*, 331 B.R. 251, 254 (Bankr. N.D. Tex. 2005) ("Great judicial

deference is given to the [t]rustee's exercise of business judgment" in approving a proposed sale

under section 363). Therefore, any party objecting to the proposed sale must make a showing of

"bad faith, self-interest or gross negligence." *In re Integrated Res., Inc.*, 147 B.R. at 656 (citing

*Smith v. Van Gorkom*, 488 A.2d at 872-73); *see also Comm. of Asbestos-Related Litigants v.

Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986)

("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a

decision made arbitrarily or capriciously), courts will generally not entertain objections to the

debtor's conduct.").

41.     In determining whether a proposed sale under section 363(b)(1) of the Bankruptcy

Code satisfies the "business judgment standard," courts consider the following: (a) whether a

sound business justification exists for the sale; (b) whether adequate and reasonable notice of the

sale was given to interested parties; (c) whether the price is fair and reasonable; and (d) whether

the parties have acted in good faith. *See*, *e.g.*, *In re N. Am. Techs. Group, Inc.*, 2010 Bankr. LEXIS

5834, *7 (Bankr. E.D. Tex. Aug. 16, 2010) (citing *In re Condere*, 228 B.R. 615, 626 (Bankr. S.D. Miss. 1998)); *In re Decora Indus., Inc*., No. 00-4459 JJF, 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (citing *In re Delaware & Hudson Ry. Co*., 124 B.R. 169, 176 (D. Del. 1991)); *In re Phoenix Steel Corp*., 82 B.R. 334, 335-36 (Bankr. D. Del. 1987).  Any proposed Sale Transaction will satisfy all these factors.

42.      *First*, the Debtors explored various alternatives toward refinancing or repaying the Prepetition Credit Agreement and have identified the sale of the NA L&A Assets as a viable option.  *See* Sale Decl. ¶ 10.  The Debtors conducted a robust prepetition marketing campaign and are well positioned to continue pursuing a value-maximizing NA L&A Sale Transaction, including through consummation of the Stalking Horse APA.  *Id.* ¶¶ 10, 12.  Accordingly, a valid business justification exists for the NA L&A Sale Transaction.

43.      *Second*, the Debtors will provide the Notices, including notice of the Bid Procedures, the Auction, and the date of the sale, as required in the Bid Procedures Order, and will provide notice of this Motion as indicated below.  The Debtors submit that such notice constitutes adequate and reasonable notice to interested parties, as set forth in the Bid Procedures Order.  The need for cash to repay the Prepetition Credit Agreement is imminent, and a more extended process may harm the Debtors' estates and the creditors thereof.

44.      *Third*, unless a Qualified Bidder (as defined in the Bid Procedures) appears willing to pay more, the value to be received by the Debtors for the NA L&A Assets, including through consummation of the Stalking Horse APA, is necessarily the best and highest possible value.  Accordingly, the price for the NA L&A Assets will be fair and reasonable.  *See id.* ¶ 20.

45.      *Fourth*, the Stalking Horse APA was the result of extensive, good faith, arms'-length negotiations between the Debtors and the Stalking Horse Purchaser.  Sale Decl. ¶ 17.

Further, under the Bid Procedures, the Debtors will have, in good faith, tested the market to ensure

that the ultimate sale price for the NA L&A Assets is the highest possible price.  To the extent the

Debtors consummate a NA L&A Sale Transaction other than the Stalking Horse APA, the Debtors

will demonstrate at the Sale Hearing that the Successful Bidder conducted itself in good faith.

46.    Accordingly, the Debtors submit that the Sale Transaction, including any such

transaction contemplated under the Stalking Horse APA, should be approved under

section 363(b)(1) of the Bankruptcy Code as a sound exercise of the Debtors' business judgment.

## VI.    The NA L&A Sale Transaction Should be Approved Free and Clear of all Liens, Claims, Interests, and Encumbrances.

47.    Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and

clear of liens, claims, interests, and encumbrances in property of an entity other than the estate if:

> (1)    applicable nonbankruptcy law permits the sale of such property free and clear of such interests;
>
> (2)    such entity consents;
>
> (3)    such interest is a lien and the price at which such property is sold is greater than the aggregate value of all liens on such property;
>
> (4)    such interest is in bona fide dispute; or
>
> (5)    such entity could be compelled, in a legal or equitable proceeding to accept a money satisfaction of its interest.

11 U.S.C. § 363(f).

48.    Because section 363(f) of the Bankruptcy Code is drafted "in the disjunctive,"

satisfaction of any one of its five (5) requirements will suffice to permit the sale of the Assets "free

and clear" of liens and interests.  *In re Nature Leisure Times*, LLC, 06-41357, 2007 WL 4554276,

at *3 (Bankr. E.D. Tex. Dec. 19, 2007); *see also Michigan Employment Sec. Comm'n v. Wolverine

Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that

section 363(f) of the Bankruptcy Code is written in the disjunctive; holding that the court may approve the sale "free and clear" provided at least one of the subsections of section 363(f) of the Bankruptcy Code is met); *In re Dundee Equity Corp.*, No. 89-B-10233, 1992 WL 53743, at *4 (Bankr. S.D.N.Y. Mar. 6, 1992) ("[S]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of [section] 363(f) have been met."); *In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D. N.Y. 1986).

49.    Furthermore, it is well established that a bankruptcy court has the power, pursuant to section 363(f) of the Bankruptcy Code, to approve the sale of the Debtors' assets free and clear of any claims. *In re TWA Airlines, Inc.*, 322 F.3d 283, 288-90 (3d Cir. 2003) (holding that successor liability claims are "interests in property" within the meaning of section 363(f)); *United Mine Workers of Am. Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.)*, 99 F.3d 573 (4th Cir. 1996) (same).

50.    The Court also may authorize the sale of the assets free and clear of any liens pursuant to section 105 of the Bankruptcy Code, even if section 363(f) did not apply. *See Matter of Selby Farms*, 15 B.R. 372, 375 (Bankr. S.D. Miss. 1981) ("The power of the Bankruptcy Court to sell property free and clear of liens has long been recognized.") (citing *Van Huffel v. Harkelrode*, 284 U.S. 225, 227-28 (1931)); *In re Trans World Airlines. Inc.*, No. 01-0056, 2001 WL 1820325, at *3 ("Bankruptcy courts have long had the authority to authorize the sale of estate assets free and clear even in the absence of [section] 363(f)."); *see also Volvo White Truck Corp. v. Chambersberg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales [free and clear of liens] is within the court's equitable powers when necessary to carry out the provisions of Title 11.").

51.     With regard to the sale of the NA L&A Assets, the Prepetition Lenders, who hold a first priority lien on substantially all of the Debtors' assets, are consenting to such sale. Accordingly, the Debtors' submit that the NA L&A Sale Transaction meets the requirements of section 363(f)(2) of the Bankruptcy Code.  To the extent any of party has a lien on any of the NA L&A Assets, such party will receive a copy of the Post-Auction Notice and will have the opportunity to object.  If the Debtors proceed with the NA L&A Sale Transaction over such objection, the Debtors will present appropriate evidence at the Sale Hearing to support approval of the NA L&A Sale Transaction under one or more subdivisions of section 363(f) of the Bankruptcy Code.  Moreover, any lien, claim, interest, or encumbrance will be adequately protected by attachment to the net proceeds of the NA L&A Sale Transaction in the same order of priority as existed prior to the Petition Date.  Therefore, the Debtors request that the NA L&A Sale Transaction to the Stalking Horse Purchaser or Successful Bidder, as applicable, be free and clear of all liens, claims, interests, and encumbrances, with such liens, claims, interests, and encumbrances, to the extent they remain, attaching to the proceeds therefrom.

**VII.   The Stalking Horse Purchaser or Successful Bidder, as applicable, is a Good Faith Purchaser Under Section 363(m) of the Bankruptcy Code and Should be Granted the Protections Therein.**

52.     Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

53.     Although the Bankruptcy Code does not define "good faith," the Fifth Circuit has determined that a good-faith purchaser is one who "purchases the assets for value, in good faith,

and without notice of adverse claims." *Hardage v. Herring Nat'l Bank*, 837 F.2d 1319, 1323 (5th Cir. 1988) (internal citations omitted). The good-faith status of a purchaser will only be destroyed with evidence of fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take unfair advantage of the other bidders. *TMT procurement Corp. v. Vantage Drilling Co. (In re TMT Procurement Corp.)*, 764 F.3d 512, 521 (5th Cir. 2014).

54.     Negotiations in connection with the Stalking Horse APA included vigorous and extensive good faith arms'-length negotiations between the Stalking Horse Purchaser and the Debtors and their advisors on the economic and legal terms of a purchase of the NA L&A Assets, culminating in the deal embodied in the Stalking Horse APA. Sale Decl. ¶¶ 17–22. There is no evidence of adverse claims on the NA L&A Assets and the Stalking Horse Purchaser has not colluded with any other party. Accordingly, the Debtors submit that the Stalking Horse Purchaser is a "good faith" purchaser as contemplated under section 363(m) of the Bankruptcy Code and should be granted the protections provided for therein.

55.     To the extent of a NA L&A Sale Transaction to a Successful Bidder other than the Stalking Horse Purchaser, the Debtors submit that the Successful Bidder would be a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code. The Bid Procedures require each Qualified Bidder participating in the Auction to confirm that it has not engaged in any collusion with respect to any Qualified Bid or the Sale Transaction contemplated thereunder. Any asset purchase agreement with the Successful Bidder will be negotiated at arms'-length and in good faith. Further, to the extent necessary, the Debtors will demonstrate at the Sale Hearing that such Successful Bidder conducted itself in good faith. Accordingly, the Successful Bidder, if any, should likewise be subject to the protections provided by section 363(m) of the Bankruptcy Code. The Debtors believe that providing the Stalking Horse Purchaser or the Successful Bidder,

as applicable, with such protection will ensure that the maximum price will be received by the

Debtors for the NA L&A Assets and closing of the NA L&A Sale Transaction will occur promptly.

**VIII.    Assumption and Assignment of the Designated Contracts Should be Authorized.**

56.    Section 365(a) of the Bankruptcy Code provides that a debtor "subject to the court's

approval, may assume or reject any executory contract or unexpired lease of the debtor."

11 U.S.C. § 365(a).  The standard governing approval of a debtor's decision to assume or reject an

executory contract or unexpired lease is whether the debtor's reasonable business judgment

supports assumption or rejection.  *In re Mirant Corp.*, 378 F.3d 511, 524-25 & n.5 (5th Cir. 2004);

*Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1301, 1309 (5th Cir. 1985); *In re Gucci*,

193 B.R. 411 (S.D.N.Y. 1996); *In re Pisces Energy, LLC*, No. 09-36591H5-11, 2009 WL 7227880,

*6 (Bankr. S.D. Tex. Dec. 21, 2009).

57.    The "business judgment" test in this context only requires that a debtor demonstrate

that assumption or rejection of an executory contract or unexpired lease benefits the estate.

*See Pisces Energy*, 2009 WL 7227880, at *6; *In re Gunter Hotel Assocs.*, 96 B.R. 696, 698

(Bankr. W.D. Tex. 1988); *In re Food City, Inc.*, 94 B.R. 91, 93-94 (Bankr. W.D. Tex. 1988).

Any more exacting scrutiny would slow the administration of a debtor's estate, increase costs,

interfere with the Bankruptcy Code's provision for private control of administration of the estate,

and threaten a court's ability to control a case impartially.  *See Richmond Leasing*, 762 F.2d

at 1311.    Prior to assuming an executory contract, however, section 365(b)(1) of the

Bankruptcy Code requires that any outstanding defaults under the contracts to be assumed be cured

or that the Debtors provide adequate assurance that such defaults will be promptly cured.

58.    The Debtors submit that, prior to any assumption of a Designated Contract, the

Debtors and/or the Stalking Horse Purchaser or Successful Bidder, as applicable, will cure any

amounts necessary to assume such Designated Contract.    Indeed, as required by the

Bankruptcy Code, the Debtors' assumption and assignment of the Designated Contracts will be contingent upon payment or reserve of the amount necessary to cure any monetary default under such contracts in connection with the Sale Transactions.

59.     Additionally, section 365(f) of the Bankruptcy Code specifically provides that contract provisions seeking to prohibit or limit assignment are unenforceable.  *See* 11 U.S.C. § 365(f)(1).  That is, once an executory contract is assumed, the trustee or debtor in possession may elect to assign such contract regardless of any such limiting contractual provisions.  *See In re Amidee Capital Group, Inc*., No. 10-20041, 2010 WL 5141276, at *5 (Bankr. S.D. Tex. Oct. 7, 2010) (treating such prohibitions or limitations as null and void under section 365(f) of the Bankruptcy Code);  *In re Office Prods. of Am., Inc*., 140 B.R. 407 (Bankr. W.D. Tex. 1992) (provisions that work as a restriction on assignment of leases should be struck down); *In re Rickel Home Center, Inc.*, 209 F.3d 291, 299 (3d Cir. 2000) ("The Code generally favors free assignability as a means to maximize the value of the debtor's estate.").

60.     Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided."  11 U.S.C. § 365(f)(2).

61.     To the extent necessary, the Debtors will present facts at the Sale Hearing to show the financial credibility, willingness and ability of the Stalking Horse Purchaser or Successful Bidder, as applicable, to perform under the Designated Contracts.  Indeed, the Bid Procedures require that each Qualified Bid identify with particularity the Debtors' executory contracts and unexpired leases sought to be assumed and assigned in connection with such bid's contemplated Sale Transaction and demonstrate that the applicable bidder can provide adequate assurance of future performance under all such executory contracts and unexpired leases.  Additionally, the

Sale Hearing will afford the Court and other interested parties the opportunity to evaluate the ability of the Stalking Horse Purchaser or Successful Bidder, as applicable, to provide adequate assurance of future performance under the Designated Contracts, as required under section 365(b)(1)(C) of the Bankruptcy Code.  As set forth above, the Debtors will give notice to all parties to the Designated Contracts, which notice will include the amounts the Debtors believe are necessary to cure any defaults in accordance with section 365(b) of the Bankruptcy Code.

62.    Accordingly, the Debtors request approval under section 365 of the Bankruptcy Code of the Debtors' assumption and assignment of the Designated Contracts in connection with the Sale Transactions.  The Debtors further request that the order approving the Sale Transactions provide that the Designated Contracts will be transferred to, and remain in full force and effect for the benefit of, the Stalking Horse Purchaser or Successful Bidder, as applicable, notwithstanding any anti-assignment or change of control provisions in the Designated Contracts, including those described in sections 365(b)(2) and (f)(1) and (f)(3) of the Bankruptcy Code that prohibit such assignment or change of control.

**EMERGENCY CONSIDERATION**

63.    The Debtors request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm."  The failure to receive the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' sale process and significantly impact the Debtors' ability to swiftly and efficiently move forward with a value-maximizing Sale Transaction. Obtaining approval of entry into the Stalking Horse APA, the Bid Protections, and the Bid Procedures (and accompanying proposed sale timeline) on an emergency basis will encourage prospective bidders to engage in the sales process expeditiously and will provide certainty to

potential bidders regarding the bid process and the proposed sale timeline.  As such, the relief requested is necessary in order for the Debtors to pursue their restructuring goals swiftly and efficiently and preserve the ongoing value of the Debtors' estates and maximize the value of their estates for the benefit of all stakeholders.  Accordingly, the Debtors have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and request that the Court approve the relief requested in this Motion on an emergency basis.

### REQUEST FOR BANKRUPTCY RULE 6004 AND 6006 WAIVERS

64.     Because time is of the essence with regard to the Sale Transactions, the Debtors request that the Court waive any applicable notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay (a) provided in Bankruptcy Rule 6004(h) in all orders requested to be entered herein, and (b) provided in Bankruptcy Rule 6006(d) in the proposed order approving the Sale Transactions.  The relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors' ongoing operations and value-maximizing sale process.  Accordingly, ample cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d), to the extent such notice requirements and such stay apply.

### RESERVATION OF RIGHTS

65.     Nothing contained herein or any action taken pursuant to relief requested is intended to be or shall be construed as (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' or any party in interest's rights to dispute the amount of, basis for, or validity of any claim or interest under applicable law or nonbankruptcy law; (c) a promise or requirement to pay any claim; (d) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law; (e) a request for or granting of approval for assumption of any agreement, contract, program, policy, or lease under

section 365 of the Bankruptcy Code; or (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any party in interest's rights to subsequently dispute such claim.

## **NOTICE**

66.    Notice of this Motion has been provided by email, facsimile, or overnight courier to the Notice Parties.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## **NO PREVIOUS REQUEST**

67.    No previous request for the relief sought herein has been made by the Debtors to this or any other court.

[Remainder of page intentionally left blank.]

The Debtors request entry of the Proposed Order, substantially in the form attached hereto, granting the relief requested herein and granting such other relief as is just and proper.

Dated: December 18, 2023
Dallas, Texas

*/s/ Thomas R. Califano*

**SIDLEY AUSTIN LLP**
Thomas R. Califano (24122825)
Rakhee V. Patel (00797213)
Jeri Leigh Miller (24102176)
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone:    (214) 981-3300
Facsimile:    (214) 981-3400
Email:    tom.califano@sidley.com
    rpatel@sidley.com
    jeri.miller@sidley.com

*and*

Andres Barajas (*pro hac vice* pending)
Weiru Fang (*pro hac vice* pending)
787 Seventh Avenue
New York, New York 10019
Telephone:    (212) 839-5300
Facsimile:    (212) 839-5599
Email:    andres.barajas@sidley.com
    weiru.fang@sidley.com

*Proposed Attorneys for the Debtors*
*and Debtors in Possession*

## <u>CERTIFICATE OF CONFERENCE</u>

I, Jeri L. Miller, conferred by e-mail with counsel to (i) the Prepetition Lenders; (ii) the Stalking Horse Purchaser; and (iii) the U.S. Trustee regarding the relief sought in this Motion to Expedite on December 18, 2023.  The Prepetition Lenders and the Stalking Horse Purchaser consented to emergency consideration of the Bid Procedures Motions.  The U.S. Trustee did not provide a response.

*/s/ Jeri L. Miller*
Jeri L. Miller