**Exhibit A**

**Sale Declaration**

SIDLEY AUSTIN LLP
Thomas R. Califano (24122825)
Rakhee V. Patel (00797213)
Jeri Leigh Miller (24102176)
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone:     (214) 981-3300
Facsimile:      (214) 981-3400
Email:            tom.califano@sidley.com
                      rpatel@sidley.com
                      jeri.miller@sidley.com

SIDLEY AUSTIN LLP
Andres Barajas (*pro hac vice* pending)
Weiru Fang (*pro hac vice* pending)
787 Seventh Avenue
New York, New York 10019
Telephone:     (212) 839-5300
Facsimile:      (212) 839-5599
Email:            andres.barajas@sidley.com
                      weiru.fang@sidley.com

*Proposed Attorneys for the Debtors*
*and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| EBIX, INC., *et al.*[1] | Case No. 23-80004 (SWE) |
| Debtors. | (Joint Administration Requested) |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Ebix, Inc. (1975), Vertex, Incorporated (6295), P.B. Systems, Inc. (9074), Ebix Consulting, Inc. (6666), Ebix US, LLC (N/A), Facts Services, Inc. (1348), Doctors Exchange, Inc. (N/A), Ebix International LLC (N/A), Agency Solutions.com, LLC d/b/a Health Connect LLC (N/A), ConfirmNet Corporation (2737), A.D.A.M., Inc. (8070), and Ebix Latin America, LLC (N/A). The Debtors' mailing address is 1 Ebix Way, Johns Creek, Georgia 30097.

**DECLARATION OF
RICHARD W. MORGNER
IN SUPPORT OF DEBTORS' MOTION
FOR ENTRY OF AN ORDER (I)(A) APPROVING
BID PROCEDURES; (B) APPROVING THE DEBTORS' ENTRY INTO THE
STALKING HORSE APA AND APPROVING BID PROTECTIONS; (C) SCHEDULING
AUCTION AND SALE HEARING; (D) APPROVING THE FORM AND MANNER OF
NOTICES RELATING TO THE SALE TRANSACTION; (E) APPROVING
ASSUMPTION AND ASSIGNMENT PROCEDURES; (II) AUTHORIZING THE SALE
TRANSACTION; AND (III) GRANTING RELATED RELIEF**

I, Richard W. Morgner, hereby declare under penalty of perjury as follows:

1. I submit this declaration (this "Declaration") in support of the *Debtors' Motion for Entry of an Order (I)(A) Approving Bid Procedures; (B) Approving the Debtors' Entry into the Stalking Horse APA and Approving Bid Protections; (C) Scheduling Auction and Sale Hearing; (D) Approving the Form and Manner of Notices Relating to the Sale Transaction; (E) Approving Assumption and Assignment Procedures; (II) Authorizing the Sale Transaction; and (III) Granting Related Relief*, filed contemporaneously herewith (the "Motion"),[2] which seeks approval of, among other things (a) the Bid Procedures that will govern the sale process and potential Auction for certain of the Debtors' assets and (b) various dates and deadlines associated therewith.

2. I understand that the Debtors have also submitted, in support of the Motion, the *Declaration of Amit K. Garg, Chief Financial Officer of Ebix, Inc., in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 16] (the "First Day Declaration"), which is incorporated by reference herein. I also make reference to *Declaration of Richard W. Morgner in Support of the Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing (A) Postpetition Financing, and (B) the Use of Cash Collateral; (II) Granting Liens and Providing Superpriority Administrative Expense Claims; (III) Granting Adequate Protection to Prepetition

---

2   Capitalized terms used but not defined herein have the meanings given to such terms in the Motion or the First Day Declaration (as defined below).

2

*Lenders; (IV) Modifying the Automatic Stay; (VI) Scheduling a Final Hearing; and (VII) Granting Related Relief* [Docket No. 14].

3.  Although Jefferies LLC ("Jefferies") is being compensated for its work as the investment banker proposed to be retained by the Debtors, I am not being compensated separately for this Declaration or testimony. Except as otherwise indicated herein, all of the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by Jefferies professionals involved in advising the Debtors in these chapter 11 cases, or information provided to me by the Debtors or their other advisors. If called upon to testify, I could and would testify to the facts set forth herein on that basis. I am over the age of 18 years and authorized to submit this Declaration.

**Professional Background and Qualifications**

4.  I am a Managing Director and Joint Global Head of the Debt Advisory & Restructuring Group at Jefferies, a global investment banking firm founded over 50 years ago, with its principal office located at 520 Madison Avenue, New York, New York 10022. Jefferies is a registered broker-dealer with the United States Securities and Exchange Commission and is a member of the Financial Industry Regulatory Authority and the Securities Investor Protection Corporation. Jefferies, together with its investment banking advisory affiliates, has over 5,000 employees located in more than 30 offices around the world. Jefferies and its senior professionals have extensive expertise providing investment banking services to financially distressed companies, creditors, committees, equity holders, asset purchasers, and other constituencies in reorganization proceedings and complex financial restructurings, both in and out of court.

5.  I have more than 30 years of investment banking and restructuring experience. Since joining Jefferies in 2009, I have provided investment banking expertise, and distressed

3

mergers and acquisition and financing advice to companies, lenders, and investors in both in- and out-of-court restructurings. Prior to joining Jefferies, I was a Managing Director and Co-Head of the mergers and acquisitions group at Miller Buckfire, where my primary responsibilities included advising companies and investors in restructuring, distressed mergers and acquisitions, distressed financing, and special situations.

6. I have personally led or had material involvement in the execution of over 100 M&A transactions during my career, many of which involved companies experiencing financial distress. In addition, I have personally led or had material involvement in approximately 30 chapter 11 cases over the last 20 years. Examples of some of these cases where I was involved in a sale process include: *AppHarvest Products, LLC* (Bankr. S.D. Tex.), *Vewd Software USA, LLC* (Bankr. S.D.N.Y.), *NPC International, Inc.* (Bankr. S.D. Tex.), *CarbonLite Holdings* (Bankr. D. Del.), *GenCanna Global* (Bankr. E.D. Ky.), *Dura Automotive Systems* (Bankr. D. Del.), *Hanjin Shipping Co.* (Bankr. D.N.J.), *Black Diamond Mining Co.* (Bankr. E.D. Ky.), *Dana Corporation* (Bankr. S.D.N.Y.), *Sundevil Power Holdings* (Bankr. D. Del.), *BMC Holdings* (Bankr. D. Minn.), and *Magnatrax* (Bankr. D. Del.).

## General Background

7. As set forth more fully in the First Day Declaration, the Debtors are a leading international supplier of on-demand infrastructure exchanges to insurance, financial services, travel, and healthcare industries. The Debtors' main focus is to develop and deploy a wide variety of insurance and reinsurance exchanges on an on-demand basis using software-as-a-service enterprise solutions in areas of customer relationship management, front-end and back-end systems, and outsourced administrative and risk compliance.

8.  The Debtors retained Jefferies as their investment banker in 2021 to, among other things, advise the Debtors and facilitate outreach in connection with an evaluation of the Debtors' immediate financing needs and potential strategic transactions, including bridge financing and asset sales. Jefferies launched a marketing process on behalf of the Debtors to explore capital raise opportunities in an effort to refinance the maturing Prepetition Credit Agreement. Despite Jefferies' robust marketing process, including engagement with over ninety parties, the Debtors did not ultimately receive any acceptable refinancing offers, and determined to terminate the process.

9.  The Debtors re-engaged Jefferies on November 25, 2022, to provide investment banking services in connection with the effort to refinance the maturing Prepetition Credit Agreement and a potential restructuring of the Debtors. A cross-sectional team of six managing directors across Jefferies' leverage finance and debt capital markets, debt advisory and restructuring, and technology groups have been overseeing these efforts. Jefferies has been integrally involved in the negotiations with existing Prepetition Lenders under the Debtors' Prepetition Credit Agreement, other creditors and stakeholders, and third parties. In addition, Jefferies, together with the Debtors' other advisors and management, have been assisting the Debtors in (i) the negotiation of a debtor in possession credit facility and assessment of alternative financing options, and (ii) running a comprehensive sale and marketing process for substantially all of the Debtors' assets.

**Prepetition Marking Process**

10. As set forth more fully in the First Day Declaration, the Debtors explored various alternatives towards a refinancing or repayment of the Credit Facility. One of these paths was a marketing process for the sale of certain of the Debtors' assets, which commenced in February

5

2023. Beginning on March 29, 2023, Jefferies distributed an initial marketing materials package with respect to a sale of the Debtors' North American operations to approximately thirty potential interested buyers. Management conducted twelve meetings with potential buyers, and provided significant initial diligence. Nine indications of interest were received in early May 2023. Based on feedback from the buyers and direction from the Debtors' Strategic Investment Committee (the "SIC"), the Debtors sought revised indications of interest for the Debtors' North American Life and Annuity Assets (the "NA L&A Assets"). Six parties submitted revised bids, and the SIC selected two bidders to continue forward in the process during the summer and fall of 2023.

11. In November 2023, the Debtors' newly-constituted finance committee and the Debtors' Board of Directors authorized Jefferies to broaden the marketing process to any and all interested buyers and expanded the scope of the potential assets to be sold beyond the NA L&A Assets. Subsequently, an additional four parties engaged in exploration of a purchase of the Debtors' assets, including the Stalking Horse Purchaser (as defined and described more fully below). To date, significant information regarding the Debtors' business has been made available in the virtual data room for potential buyers, which includes more than 450 files comprising more than 25,000 pages of diligence.

12. The Debtors intend to continue to pursue the sale of assets commenced prepetition with the aim of swiftly achieving a value-maximizing transaction. I believe that the marketing process, to be conducted in accordance with the Bid Procedures requested in the Motion, should be sufficient to identify potential bidders and facilitate an orderly, competitive, and efficient bidding and auction process in a fair and transparent manner.

**Bid Procedures**

13. The proposed Bid Procedures contemplate an open auction process for some or all of the Debtors assets, including the NA L&A Assets (collectively, the "Assets"), with appropriate requirements to submit a qualified bid, and provide potential bidders with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid. I believe the Bid Procedures should increase the likelihood that the Debtors will obtain the highest or otherwise best value for the Assets to the benefit of the Debtors' estates and all parties in interest.

14. In formulating the proposed sale timeline, the Debtors balanced the need to find a buyer for the Assets quickly and efficiently against the need to provide adequate time for potential purchasers to conduct due diligence and submit bids. As described more fully above, prior to the Petition Date, the Debtors, with the assistance of Jefferies, conducted a marketing process for certain of the Debtors' Assets and, as discussed below, were able to agree with the Stalking Horse Purchaser (as defined below) on a Stalking Horse APA to establish a framework and a floor for the purchase price of the NA L&A Assets. The Bid Procedures provide for an approximately month and a half postpetition marketing and bidding process for the NA L&A Assets, subject to the Stalking Horse APA, to be followed by the Auction to the extent multiple bids are received. The Bid Procedures also provide for an approximately four month postpetition marketing and bidding process for non-NA L&A Assets, to be followed by the Auction to the extent multiple bids are received.

15. I believe that this timeline is appropriate under the facts that exist here. As described more fully above, the Debtors have been engaged in marketing the Assets for many months prior to the Petition Date. In addition, potential bidders already have access to a significant

amount of diligence with respect to the Debtors' Assets, and with respect to the NA L&A Assets, have a framework within which to structure the purchase of these Assets in the form of the Stalking Horse APA. The time and process proposed by the Bid Procedures, therefore, balance the need to proceed expeditiously and the chances of obtaining value maximizing bids for the Debtors' Asset.

16. Accordingly, I believe the Bid Procedures are reasonable, and appropriate and should be approved.

### The Stalking Horse Bid

17. Prior to the Petition Date, the Debtors, together with their advisors, determined that entry into an agreement with a stalking horse for the NA L&A Assets would maximize value by providing a framework and a floor for these assets. Accordingly, the Debtors and their advisors worked to secure a stalking horse bid (the "Stalking Horse Bid") for the NA L&A Assets submitted by Zinnia Distributor Solutions LLC (the "Stalking Horse Purchaser"). Negotiations in connection with the Stalking Horse Bid included extensive arms'-length negotiations between the Stalking Horse Purchaser and the Debtors and their advisors on the economic and legal terms of a purchase of the NA L&A Assets culminating in the deal embodied in that certain asset purchase agreement between the Debtors and the Stalking Horse Purchaser (the "Stalking Horse APA"). As set forth in the Stalking Horse APA, the Stalking Horse Purchaser is prepared to expeditiously complete the diligence process and execute definitive documentation to consummate purchase of the NA L&A Assets, subject to higher or otherwise better offers at the Auction.

18. The Stalking Horse APA contemplates certain bid protections (the "Bid Protections") including (a) a provision for reimbursement of reasonable and documented fees and expenses not to exceed $3 million (the "Purchaser Expense Reimbursement") following the termination of the Stalking Horse APA under certain circumstances and (ii) a breakup fee equal to

8

3% of the Purchase Price, payable in the event that the Stalking Horse APA is terminated under certain circumstances or the Debtors consummate an alternative transaction (the "Breakup Fee"). Based on my experience and the facts that exist here, I believe that the Bid Protections, including the Breakup Fee and Purchaser Expense Reimbursement, are customary and usual, typically required by stalking horse bidders, and are reasonable under the circumstances. The Stalking Horse Bid sets a floor for the value of the NA L&A Assets, encouraging potential buyers to meet or exceed a fair price for the NA L&A Assets and maximizing the realizable value of the NA L&A Assets to the benefit of all parties in interest. Additionally, the Stalking Horse APA ensures that the Debtors will have a purchaser for the NA L&A Assets, which accounts for a substantial portion of the Debtors' North American Assets. Accordingly, I believe that being able to secure the Stalking Horse Purchaser's commitment to purchase the NA L&A Assets is beneficial to the sale process. Further, the payment of the Bid Protections will not diminish the Debtors' estates to the extent they become payable in an Auction because any competing bid must exceed the Stalking Horse Bid by an amount in excess of the sum of the Breakup Fee and the Purchaser Expense Reimbursement.

19. Finally, the Debtors worked to minimize the amount and circumstances in which the Bid Protections would be payable. I believe that the Bid Protections, as a whole, are comparable to the bid protections often provided to similar bidders in other bankruptcy cases.

20. Accordingly, based on my experience, and my review of the negotiations and proposals received to date, the proposed purchase of the NA L&A Assets as contemplated by the Stalking Horse APA is the result of extensive, good-faith, arms'-length negotiations, and is currently the highest and best proposal. I further believe that entry into the Stalking Horse APA has put the Debtors in a position, despite a challenging liquidity position, to solicit competing bids

that may be materially higher or may provide otherwise better value to the Debtors' estates than the Stalking Horse Bid.

21. Accordingly, in light of the circumstances and in the context of the proposed sale processes, I believe that entering into the Stalking Horse APA, including granting the Bid Protections is in the best interest of the Debtors' estates, and should be approved.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: December 18, 2023

*/s/ Richard W. Morgner*
Richard W. Morgner