KANE RUSSELL COLEMAN LOGAN PC
John J. Kane (24066794)
JaKayla DaBera (24129114)
901 Main Street, Suite 5200
Dallas, TX 75202
Telephone:    (214) 777-4200
Facsimile:    (214) 777-4299
Email:        jkane@krcl.com
              jdabera@krcl.com

*and*

MAYER BROWN LLP
Brian Trust (admitted *pro hac vice*)
Sean T. Scott (admitted *pro hac vice*)
Jamie Netznik (admitted *pro hac vice*)
Dabin Chung (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020
Telephone:    (212) 506-2500
Facsimile:    (212) 262-1910
Email:        btrust@mayerbrown.com
              stscott@mayerbrown.com
              jnetznik@mayerbrown.com
              dchung@mayerbrown.com

*Attorneys for Regions Bank as the DIP Agent*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| EBIX, INC., *et al.*[1] | Case No. 23-80004 (SWE) |
| Debtors. | (Jointly Administered) |

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Ebix, Inc. (1975), Vertex, Inc. (6295), PB Systems, Inc. (9074), Ebix Consulting, Inc. (6666), Ebix US, LLC (N/A), Facts Services, Inc. (1348), Doctors Exchange, Inc. (N/A), Ebix International LLC

## DIP AGENT'S OMNIBUS REPLY IN SUPPORT OF
## THE DEBTORS' DIP FINANCING MOTION

Regions Bank, as DIP Agent, on behalf of itself and the DIP Lenders (the "DIP Lenders"), by and through its undersigned counsel, hereby files this omnibus reply (this "Reply") in support of the *Debtors' Emergency Motion For Entry of Interim and Final Orders (I) Authorizing (A) Postpetition Financing and (B) the Use of Cash Collateral; (II) Granting Liens and Providing Superpriority Administrative Expense Claims; (III) Granting Adequate Protection to Prepetition Lenders; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* (the "Motion") [Docket No. 13].  In support of this Reply, the DIP Agent states as follows:[2]

## PRELIMINARY STATEMENT

1. The DIP Facility is the only available source of funding for these chapter 11 cases. Absent access to and certainty of the full DIP Facility, the Debtors could not fund ordinary operations, including employee payroll, vendors, and intercompany obligations, much less the administrative expenses that will provide a clear runway to value-maximizing asset sales and the continuation of the Debtors' businesses as going concerns.  The DIP Facility comprises terms that the DIP Agent, DIP Lenders, and the Debtors heavily negotiated at arm's-length, and the objecting parties offer no alternatives to finance these cases, instead seeking to renegotiate by litigation terms that they find disagreeable.  But, as the evidence clearly demonstrates, the DIP Lenders are not and would not be willing to lend to the Debtors absent the heavily negotiated terms of the DIP

---

(N/A), Agency Solutions.com, LLC d/b/a Health Connect LLC (N/A), ConfirmNet Corporation (2737), A.D.A.M., Inc. (8070), and Ebix Latin America, LLC. (N/A).   The Debtors' mailing address is 1 Ebix Way, Johns Creek, GA 30097.

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

Facility, and the objectors' brinksmanship threatens loss of that committed financing, and resulting value destruction, to the detriment of all the estate's stakeholders.

2.        As set forth in the Morgner Declaration [Docket No. 14], the Debtors were unable to secure any alternative DIP financing—much less financing on better terms than those offered by the Prepetition Lenders—and, as a result, the Debtors straightforwardly determined that the DIP Facility is the best financing available to the estate.  The terms of the DIP Facility (including now-contested features, such as the Roll-Up, fees and pricing, and liens over unencumbered assets) not only were the product of good faith negotiations between the DIP Lenders and the Debtors, but also are consistent with prevailing market terms of facilities of this type.  More fundamentally, without such terms, the DIP Lenders would not have funded the DIP Facility, and, without the DIP Facility, the Debtors would be unable to fund their chapter 11 cases.

3.        In their objections to the DIP Facility, the Office of the United States Trustee for Region 6 (the "U.S. Trustee" and the "U.S. Trustee Objection", [Docket No. 142]) and the Official Committee of Unsecured Creditors (the "UCC" and the "UCC Objection", [Docket No. 229]) seek to rewrite the negotiated terms with a wish list of one-sided concessions divorced from the realities of this case.  The U.S. Trustee Objection generally objects to certain aspects of the DIP Facility, including the fact that there is a roll-up and that the Debtors granted liens on avoidance actions, despite that these were core, bargained-for terms that the DIP Lenders sought in exchange for commitments to advance $35 million in much-needed money.  And the UCC even more broadly objects to the DIP Facility, despite its constituency unequivocally benefitting from the DIP Facility—both initially through prepetition payments and critical vendor payments, as well as ultimately from the potential path to a partial or even full recovery from the sale process.

4.      The objections are meritless, and the Court should not displace the Debtors' sound business judgment, exercised for the benefit of all estate stakeholders, for the narrow interests of potentially out-of-the-money or non-economic stakeholders.  Given the evidence before the Court, the facts and circumstances of the case, and the arguments below, the DIP Agent respectfully requests the Court approve the Motion on a final basis in the proposed form of order that was filed at Docket No. 238 (the "Proposed Final Order").

## ARGUMENT

**A.      The Roll-Up Is Consistent with Market Terms, and the Court's Approval Thereof Is in the Best Interest of the Debtors' Estate and Stakeholders.**

5.      From day one of the negotiations, the DIP Lenders have insisted that the Roll-Up is a requirement of their commitment to advance funds post-petition and it continues to be a requisite element of their willingness to lend pursuant to the DIP Facility, a feature which both the U.S. Trustee and UCC oppose.  While the U.S. Trustee objected because any roll-up is allegedly impermissible, the UCC asserts that the Roll-Up should be effective only after the expiry of the Challenge Period and that the Roll-Up should be based on amounts drawn and not the total commitment by the DIP Lenders.  U.S. Trustee Obj., ¶¶ 17-18; UCC Obj., ¶ 33.  Neither objector's position is supported by legal authority, market conditions, or the facts and circumstances of this case, and neither objector offers any evidence to displace the Debtors' exercise of business judgment in agreeing to the Roll-Up.

6.      In determining whether to approve a motion to obtain credit, bankruptcy courts generally permit debtors-in-possession to exercise their basic business judgment consistent with their fiduciary duties.  *In re Estrada*, 2016 WL 745536, at *3 (Bankr. S.D. Tex. Feb. 24, 2016).  Courts analyze the provisions of debtor-in-possession financing (including roll-ups) through the lens of the unique facts and circumstances of each individual case.  *See* Exhibit A; Transcript for

Final DIP Hearing, *In re MLCJR LLC*, No. 23-90324-11 (CML) [Docket No. 540] at 110 (Bankr. S.D. Tex. June 13, 2023) ("when I think about DIPs, I think every case has to be viewed under its own facts and circumstances and what the needs are. . . . I don't think there's a right answer[, w]hether, you know, in every case where there ought to be a one-to-one or a two-to-one or a three-to-one or a four-to-one.  I think every case is different and every fact scenario is different.").

7.       When analyzing the provisions of DIP facilities, courts have noted that [c]hapter 11 post-petition financing is fraught with dangers for [DIP] creditors."  *In re Farmland Indus., Inc.*, 294 B.R. 855, 885 (Bankr. W.D. Mo. 2003) (citation omitted).  As a result, roll-ups are one common feature of debtor-in-possession financing that are intended to act as consideration for the lenders that are willing to infuse much-needed capital to debtors.  *See* Exhibit B; Transcript of Final Hearing on Motion for Post-Petition Financing at 753, *In re Lyondell Chem. Co.*, No. 09-10023 (REG) (Docket No. 3740) (Docket No. 3740) (noting that the roll-up "was an element of the consideration offered to those willing to lend new money that the debtors badly needed.").  As such, DIP financing lenders are entitled to bargain for protective terms that compensate them for the risk they incur by providing additional liquidity to the chapter 11 debtors' estates, and, here, the DIP Lenders have bargained for the Roll-Up.

8.       Neither the U.S. Trustee nor the UCC provides any legal support or market evidence that is sufficient for the Court to disregard the Debtors' business judgment and deny the heavily negotiated Roll-Up.[3]  *See* U.S. Trustee Obj., ¶¶ 17-22; *see* UCC Obj., ¶ 33.  Indeed, the

---

[3]     The case law cited by the UCC for the proposition that a court may find that a debtor did not exercise reasonable business judgment in entering into a debtor-in-possession financing is easily distinguishable from the facts of this case.  The court in *In re Laffite's Harbor* took issue with the debtors there, which were only seeking financing from one third-party financier and no other lender, essentially "[converting] the bankruptcy process . . . to one designed for the unwarranted benefit of the postpetition lender."  *In re Laffite's Harbor Dev. I, LP*, 2018 WL 272781 at *3 (Bankr. S.D. Tex. Jan. 2, 2018).  The court in *In re Defender Drug Store* scrutinized and ultimately approved the 10% "enhancement fee," which the Bankruptcy Appellate Panel of the Ninth Circuit then upheld.

Debtors have demonstrated, through their declarants, a critical need for immediate additional liquidity through the DIP Facility to continue the business operations and preserve the Debtors' going concern value for the benefit of all stakeholders. Morgner Decl. ¶ 13. The terms of the DIP Facility are the product of rigorous arm's-length negotiations among the Debtors, the DIP Lenders, and their respective professionals over several months during a forbearance period. Morgner Decl. ¶ 19. As a result of these negotiations, 100 percent of the Prepetition Secured Parties agreed to participate in the DIP Facility and provide their pro rata share of $35 million of new money. Morgner Decl. ¶ 21. In addition, the Debtors have stated they could not secure financing on better terms than those offered by the DIP Lenders. Morgner Decl. ¶ 16. As it stands, this DIP Facility is the only source of financing the Debtors can rely on to ensure they have sufficient liquidity to run a value-maximizing sale process, operate their businesses in the ordinary course, and administer their estates. Morgner Decl. ¶ 12. The Debtors have stated that the proposed DIP Facility is in the best interests of the Debtors, their estates, and their creditors. Morgner Decl. ¶ 16.

9.        The Roll-Up is a non-negotiable feature of the DIP Facility, without which the DIP Lenders would not have provided funding for the Debtors. Morgner Decl. ¶ 21. In this case, the Roll-Up is intended to act as consideration for the DIP Lenders to infuse a total of $35 million of new money into the Debtors after multiple prepetition maturity extensions. Contrary to the arguments made by the U.S. Trustee (U.S. Trustee Obj., ¶ 18), the Roll-Up does not unduly improve the position of the DIP Lenders or cede control of the chapter 11 cases to the DIP Lenders

---

*Resolution Tr. Corp. v. Unsecured Creditors (In re Defender Drug Stores, Inc.)*, 145 B.R. 312, 313, 319 (B.A.P. 9th Cir. 1992).

to the detriment of the other stakeholders.[4]  Among other things, the Roll-Up only comprises a small percentage of the Prepetition Secured Debt and was necessary to incentivize holders of that debt (in the principal amount of approximately $617 million) to extend new credit.  Such financing allowed the Debtors to negotiate a stalking horse APA and receive approval of the Bid Procedures Motion,[5] which contemplates a stalking horse bid of $400 million for the Debtors' North American life and annuity assets.  Such a sale, when consummated, would be more than ample to cover the repayment of the DIP Facility (including the Roll-Up) and also would inure to the benefit of the Debtors' employees, customers, vendors, and other parties-in-interest.

10.    The UCC asserts that the Roll-Up should not be effective until the end of the Challenge Period, and should only be on drawn amounts, but offers threadbare argument and legal precedent to support its position.  UCC Obj., ¶ 33.  At root, the UCC would simply prefer the Roll-Up be formulated differently and, more precisely, in a way that diminishes the protections bargained for by the DIP Lenders, which have far more exposure in this case than the UCC's own constituents (whose exposure, based on the Debtors' filings, is $14.5 million).  The UCC simply wishes to disregard that the Roll-Up is required consideration for the $35 million of new money the DIP Lenders are providing to the Debtors' estates along with their agreement (in their capacity as Prepetition Lenders) to let the Debtors' use their Cash Collateral and be primed by the DIP

---

[4]    In *Sunland Medical*, the U.S. Trustee made a nearly identical argument against the inclusion of a roll-up of prepetition debt in connection with post-petition financing, which was then rejected by the court.  *See* Exhibit C; Transcript of Final DIP Hearing, *In re Sunland Med. Found.*, No. 23-80000 (Bankr. N.D. Tex. September 24, 2023) [Docket No. 350] ("[T]his DIP is the only option for the debtors.  It is at the benefit of bondholders who have put money on top of money on top of money in this instance.  I believe that the roll-up is well within market in this instance and it will be approved.")

[5]    *Debtors' Emergency Motion For Entry of an Order (i)(a) Approving Bid Procedures; (b) Approving the Debtors' Entry Into the Stalking Horse APA and Approving Bid Protections; (c) Scheduling Auction and Sale Hearing; (d) Approving the Form and Manner of Notices Relating to the Sale Transaction; (e) Approving Assumption and Assignment Procedures; (ii) Authorizing the Sale Transaction and (iii) Granting Related Relief* [Docket No. 43] (the "Bid Procedures Motion").

Loans.  And such consideration is in no way unusual or unprecedented; the UCC's intimations to the contrary, roll-ups that are effective before the term of the Challenge Period (and even at the entry of an interim order) or that are based on the full committed amount (and not on the drawn amounts) are both commonplace in this Circuit.  *In re Venator Materials PLC*, No. 23-90301 (DRJ) (Bankr. S.D. Tex. May 16, 2023) [Docket No. 98] (approving the roll-up in the interim order); *In re Invacare Corp.*, No. 23-90068 (CML) (Bankr. S.D. Tex. Feb. 2, 2023) [Docket No. 96] (approving in interim order the indefeasible roll-up of the prepetition revolving credit facility into the ABL DIP facility); *see In re Sunland Med. Found.*, No. 23-80000-MVL-11 (Bankr. N.D. Tex. September 24, 2023) (approving a roll-up of $21.25 million of the full amount of $14 million in new money loans); *In re Rockall Energy Holdings, LLC*, No. 22-90000 (MXM) (Bankr. N.D. Tex. May 3, 2022) [Docket No. 408] (authorizing a roll-up of approximately $34 million in prepetition debt of which $10 million rolled up in the interim order and the remainder in the final order); *In re Trivascular Sales LLC*, No. 20-31840 (SGJ) (Bankr. N.D. Tex. August 20, 2020) [Docket No. 268] (authorizing a roll-up of approximately $100 million of prepetition debt upon the entry of the final order).

11.    In the end, the UCC has failed to demonstrate why the Court should disregard a material inducement the DIP Lenders relied on when agreeing to provide the Debtors' estate with $35 million of new money, allow the Debtors to use their Cash Collateral, and to allow their prepetition debt and prepetition collateral to be primed.  The Roll-Up conforms to the abundance of market precedent in this District and this Circuit and throughout this country, and it was the product of arm's-length discussions between the Debtors and the DIP Lenders.[6]  By agreeing to

---

[6]    The extent and timing of the Roll-Up align closely with those recently approved by the courts in this District and throughout the nation in connection with "mega" chapter 11 cases.  *See, e.g.*, *In re Rockall Energy Holdings, LLC*, No. 22-90000 (MXM) (Bankr. N.D. Tex. May 3, 2022) [Docket No. 408] (authorizing a 2:1 roll-up of approximately $34 million in prepetition debt and $17 million of new money); *In re CiCis Holdings, Inc.*, No.

fund the DIP Facility, the DIP Lenders are conferring an incontrovertible benefit to the Debtors'

estates that no other party has been ready, willing, or able to provide. The Roll-Up is an essential

feature of the DIP Facility, allowing the Debtors to maintain their operations and maximize their

going concern value, and the DIP Lenders would not fund the DIP Facility without it.

**B.     The DIP Liens on Avoidance Actions and the Proceeds Thereof Are Necessary and Appropriate.**

12.     Both the U.S. Trustee and the UCC object to the commonplace DIP Facility

provisions granting the DIP Lenders and Prepetition Lenders liens over previously unencumbered

assets, including avoidance actions and avoidance proceeds. U.S. Trustee Obj., ¶¶ 21-22; UCC

Obj., ¶¶ 16-20. However, this position is not only not supported by legal authority or precedent,

but also would require the DIP Lenders to lend new money, and the Prepetition Lenders to be

primed by such new money, without any new or additional collateral—something that no rational

lender would be willing to do.

13.     As an incentive for lenders to extend post-petition credit to debtors-in-possession,

the Bankruptcy Code expressly and statutorily authorizes debtors to obtain financing "secured by

a lien on property of the estate that is not otherwise subject to a lien." 11 U.S.C. § 364(c)(2). Both

the Bankruptcy Code and governing Fifth Circuit authority also make clear that avoidance action

---

21-30146 (SGJ) (Bankr. N.D. Tex. February 18, 2021) [Docket No. 280] (authorizing a 2:1 roll-up of approximately $6 million of prepetition debt and $3 million of new money); *In re Studio Movie Grill Holdings, LLC*, No. 20-32633 (SGJ) (Bankr. N.D. Tex. December 1, 2020) [Docket No. 280] (authorizing a 2:1 roll-up of approximately $47.8 million of prepetition debt and $22.8 million of new money); *In re Trivascular Sales LLC*, No. 20-31840 (SGJ) (Bankr. N.D. Tex. August 20, 2020) [Docket No. 268] (authorizing a 3:1 roll-up of approximately $100 million of prepetition debt and $30.8 million of new money); *In re Unit Corp.*, No. 20-32740 (DRJ) (Bankr. S.D. Tex. June 19, 2020) (authorizing a 2.67:1 roll-up of approximately $96 million of prepetition debt and $36 million of new money); *In re Noble House Home Furnishings LLC*, No. 23-90773 (CML) (Bankr. S.D. October 4, 2023) [Docket No. 130] (authorizing a roll-up more than 6:1 of approximately $73 million of prepetition debt and $12.2 million of new money). The Roll-Up, as presented in the Motion, is well within the market of what has been approved by this Court in other comparable cases, and the U.S. Trustee and the UCC have failed to explain why the facts and circumstances of this case warrant a deviation from established circuit precedent.

proceeds specifically belong to a debtor's estate and must be allocated to claimants in accordance with the priority of distribution set forth under the Bankruptcy Code. *See*, *e.g*., 11 U.S.C. §§ 550(a) (preserving recoveries on avoidance actions "for the benefit of the estate"); 541(a)(3), (4); *Briar Capital Working Fund Capital, L.L.C. v. Remmert (In re S. Coast Supply Co.),* No. 22-20536, 2024 U.S. App. LEXIS 1417, at *11 (5th Cir. Jan. 22, 2024) (holding that "[avoidance] actions plainly fit the statutory definition of 'property of the estate'"); *McFarland v. Leyh (In re Tex. Gen. Petrol. Corp.)*, 52 F.3d 1330, 1334–36 (5th Cir. 1995).

14.     As a result, it is unremarkable that bankruptcy courts across the nation have nearly uniformly concluded that proceeds of avoidance actions are not for the exclusive benefit of unsecured creditors and may be pledged as collateral to secure post-petition financing.  Going a step further, the Fifth Circuit just this past week issued an opinion in *Briar Capital* holding that a debtor may sell avoidance actions to third parties that would not otherwise even have standing to pursue such claims, despite the fact that proceeds from such actions would not be shared with other creditors. *Briar Capital*, 2024 U.S. App. LEXIS 1417, at *14-15.  Similarly, in *Mellon Bank, N.A v. Dick Corp.*, the Seventh Circuit held that the debtor's grant of a lien on the proceeds of avoidance actions complied with section 550(a) and benefited the estate by allocating the value of the avoidance actions to the "objecting secured lenders to compensate them from risk" related to post-petition financing.  *Mellon Bank, N.A. v. Dick Corp.*, 351 F.3d 290, 292-93 (7th Cir. 2003); *Rushton v. Bank of Utah (In re C.W. Mining Co.)*, 477 B.R. 176, 189 (B.A.P. 10th Cir. 2012) (noting that, with respect to 550(a) actions, "[t]his Court has specifically rejected the position that 'benefit of the estate' means 'payment to general unsecured creditors' and has held that 'benefit of the estate' should be interpreted broadly") (citation omitted); *see also Rafool v. Propack Sys., LLC (In re Fleming Packaging Corp.)*, 2007 WL 4556985 at *6 (Bankr. C.D. Ill. Dec. 20, 2007)

("This Court does not consider Section 550(a)'s 'for the benefit of the estate' phraseology as a statutory requirement that the unsecured creditors benefit directly from the recovery of an avoided transfer, *i.e.*, that the recovered funds end up in the pockets of unsecured creditors."); *see also In re Metaldyne Corp.*, 2009 WL 2883045, at *4 (Bankr. S.D.N.Y. June 23, 2009) (approving the pledge of avoidance actions where "[t]he [d]ebtors have only limited unencumbered assets upon which replacements liens can be provided: avoidance actions and [u]nencumbered [f]oreign [s]tock").

15.     The UCC's arguments to the contrary rely on outdated case law that, simply put, does not comport with binding Fifth Circuit precedent, modern theory, or practice in terms of DIP financing.  UCC Obj., ¶¶ 16-20.  The Fifth Circuit acknowledged in *Briar Capital* that the fiduciary duty to maximize the value of a bankruptcy estate may include, and even require, the sale of avoidance actions.  *Briar Capital,* 2024 U.S. App. LEXIS 1417, at *14, *16 (citing *In re Simply Essentials, LLC,* 78 F.4th 1006, 1010 (8th Cir. 2023)).  Moreover, in overruling a similar objection of the unsecured creditors' committee, the *Revlon* court may have stated it best: "[t]here is simply no serious legal basis to contend that avoidance action proceeds are legally required to be preserved for unsecured creditors or to conten[d] that they cannot be properly pledged in appropriate circumstances."  Exhibit D; Transcript of Final DIP Hearing at 29-30, *In re Revlon, Inc., et al.*, 22-10760 (DSJ) (Bankr. S.D.N.Y. August 1, 2022) [Docket No. 332].  As that court went on to note, pledging proceeds of avoidance actions to DIP lenders "particularly makes commercial sense and comports with fairness" when they are "contributing substantial new value to the estate" and there is "essentially no other unencumbered source of collateral to backstop that vital financing, which is critical to [the debtors'] success and to the interests of all creditors and to the estate as a whole."  Exhibit D; *Id*. at 30.

16.    Here, the proceeds of avoidance actions likewise comprise an essential part of the DIP financing collateral, as well as the adequate protection package that is part and parcel of the Prepetition Lenders' consent to be primed.  Essentially all of the prepetition assets of the Debtors are encumbered in favor of the Prepetition Secured Parties, so one of the only pools of unencumbered assets remaining are the estate's avoidance actions and the proceeds thereof.  The DIP Lenders' and Prepetition Lenders' liens over avoidance actions were specifically negotiated for by the DIP Lenders and the Debtors and were and remain a material inducement to the DIP Lenders to lend $35 million of new money.

17.    The U.S. Trustee objects *per se* to the Court's ability to grant liens over the avoidance actions,[7] relying solely on the Third Circuit's decision in *In re Cybergenics Corp.*, 226 F.3d 237 (3d Cir. 2000).  U.S. Trustee Obj., ¶ 21.  However, as noted above, the Fifth Circuit rejected *Cybergenics* and  adopted  the position in *Briar Capital* that avoidance actions constitute property of the estate and may be transferred by a debtor to maximize value of the estate.  *Briar Capital, 2024 U.S. App. LEXIS 1417, at *11, 14; see also Ward v. Cross Keys Bank (In re Karcredit, LLC)*, 2022 WL 4103265 at *3 (5th Cir. Sep. 7, 2022) ("[I]t is well established that a claim for fraudulent conveyance is included within estate property") (citation omitted); *Cadle Co. v. Mims (In re Moore)*, 608 F.3d 253, 261 (5th Cir. 2010) ("[F]raudulent-transfer claims under Texas state law . . . become estate property . . . [and the debtor] may therefore sell these state law fraudulent-conveyance actions."); *Pitman Farms v. ARKK Food Co. (In re Simply Essentials, LLC)*, 78 F.4th 1006, 1010-11 (8th Cir. 2023) (holding that, "[e]ven if there were any ambiguity in the statutory language we are persuaded by the consensus of courts across the country:

---

[7]    The U.S. Trustee also argues that the Debtors should be required to produce a valuation for the potential avoidance actions at this stage, but the DIP Agent is unable to find any legal basis to support this demand and submits that this request is at best premature.  U.S. Trustee Obj., ¶ 22.

avoidance actions are property of the estate" and affirming the bankruptcy court's decision to approve the sale of the estate's avoidance actions to a creditor).[8]   In short, the U.S. Trustee's position is against the weight of recent authority and offers no sound foundation to disapprove the DIP Facility.

18.     The UCC further argues that any lien over avoidance actions and avoidance proceeds is improper because the DIP Lenders may be the subject of avoidance actions, largely relying on precedents where the DIP lenders already were the subjects of challenges and investigations (e.g., arising from prepetition liability management transactions or LBOs)—fact patterns that are wholly inapplicable here.  To the DIP Lenders' knowledge, no party-in-interest has asserted that any colorable claims might exist against the Prepetition Secured Parties, who lent hundreds of millions of dollars to facilitate the Debtors' prepetition operations, and extended the maturity of their facility multiple times to allow the Debtors to pursue prepetition refinancing opportunities.  Simply put, there is nothing unusual or novel about those lending relationships, and any suggestions by the UCC that there may be potential avoidance actions against the DIP Agent and/or the DIP Lenders are unfounded.  And the suggestion by the UCC that the DIP Lenders are somehow trying to "moot the issue of the validity of their prepetition liens" completely disregards the purpose of the Challenge Period.   UCC Obj., ¶ 18.

19.     In sum, liens over avoidance actions were a negotiated contractual right transferred to the DIP Lenders and Prepetition Lenders as consideration for making the DIP Loans and

---

[8]   The Eighth Circuit noted in *Simply Essentials* that it can "find no case, where a court has denied a motion to sell after finding avoidance actions were not part of the estate." *Id*. at 1010.  The Eighth Circuit also reasoned that *Cybergenics*, the case most contrary to its position, merely held that avoidance actions are not "assets" of the estate and did not decide whether such avoidance actions were "property of the estate," which have different meanings.  *Id*. at 1010 (citing *Cybergenics*, 226 F.3d at 246).  And, once the proceeds of avoidance actions are realized, they must be paid to creditors in the order of statutory authority; unsecured creditors may not simply cut in line.  *See* 11 U.S.C. § 550(a) (providing the proceeds of avoidance actions are recovered "for the benefit of the estate").

consenting to priming and use of Cash Collateral, respectively, and there is no legal restriction against the Debtors' sound exercise of business judgment in this regard. Courts in this District have regularly allowed liens over avoidance actions as part of a final DIP order. *See In re Vista Proppants and Logistics, LLC*, No. 20-42002 (ELM) [Docket No. 219] (Bankr. N.D. Tex. Jul. 16, 2020) (granting liens on both avoidance actions and the proceeds thereof); *In re CiCi's Holdings, Inc., et al.*, No. 21-30146 (SGJ) [Docket No. 130], ¶ 6 (Bankr. N.D. Tex. Feb. 18, 2021) [Docket No. 130], ¶ 6 (same); *In re Corsicana Bedding, LLC, et al.*, No. 22-90016 (ELM) [Docket No. 211], ¶ 2.1(a) (Bankr. N.D. Tex. July 28, 2022) (approving debtor-in-possession financing providing for liens on proceeds of chapter 5 avoidance actions despite U.S. Trustee objecting on the basis that no analysis on such avoidance actions was provided). The Court should overrule the U.S. Trustee's and UCC's objection in this regard and approve the DIP Lenders' and Prepetition Lenders' liens on the avoidance actions and their proceeds.

**C.**   **The Challenge Period, the Challenge Budget, and Standing Procedure Are Appropriate and Should Be Granted by the Court.**

20.   In providing for the Challenge Period and Challenge Budget, the DIP Agent recognizes the UCC's duty to its constituents and its rights under section 1103(c)(2) of the Bankruptcy Code. However, the DIP Agent disputes that there is any basis to deviate from this District's complex case procedures and the milestones of the case (some of which have already been approved in the context of a Bid Procedures Motion that was uncontested by the UCC) to allow a lengthier or costlier investigation period. As discussed below, any investigation into the conduct and validity of the liens and claims of the Prepetition Secured Parties (and related releases)

should be straightforward, particularly as all the filing entities are incorporated in the United States, contrary to what the UCC seems to believe.  UCC Obj., ¶ 2(g).

21.     In that regard, the UCC's request to extend the Challenge Period from 60 days to 150 days should be denied.  The scope of the investigation that the UCC must perform before the close of the Challenge Period is in no way unusual, particularly given the professional qualifications and bench strength of the UCC's retained professionals.  Rhetoric aside, the UCC has failed to proffer any evidence that its investigation would be sufficiently complicated that it would warrant such a significant extension, which would contravene this District's requirement that the challenge period not exceed 90 days.[9]

22.     Likewise, the $75,000 Challenge Budget is sufficient, given the facts and circumstances of this case.  While Ebix, Inc. and its affiliates indeed have operations globally, the only Ebix entities that have filed for chapter 11 are U.S. entities, and the associated liens and claims are uncomplicated and easily investigated.  As such, there is no reason the UCC's investigation would be particularly extensive or costly.  Consistent with the Bankruptcy Code and governing precedent, the UCC may elect to expend funds in excess of the Challenge Budget, but any such funds may not be paid out of the DIP Collateral or Cash Collateral of the Prepetition Lenders and, instead, will be subject to the ordinary rules governing allowance of administrative expense claims of estate professionals.  And, with respect to the UCC's Objection that the Challenge Budget not

---

[9]     Section 14(b) of the Procedures for Complex Cases in the Northern District of Texas (February 6, 2023) reads as follows: "Unless otherwise ordered by the Court, an order approving a Financing Motion that contains provisions pursuant to which the debtor(s): (i) stipulates, acknowledges, or otherwise admits to the amount, validity, priority, extent, and/or perfection of prepetition claims and/or liens; and/or (ii) releases claims, shall provide parties other than the debtor(s) with: (A) seventy-five (75) days from entry of the first interim order; and (B) as to an official committee appointed under 11 U.S.C. § 1102, sixty (60) days from the date of appointment, if appointed within thirty (30) days of the petition date, **and in any event not more than ninety (90) days of the petition date**, to investigate, challenge and not be bound by such stipulations or releases by filing a complaint or motion seeking authority to commence litigation as a representative of the estate." (emphasis added).

apply to other DIP Facility-related matters, advisors to the DIP Agent and the Debtors have previously confirmed their understanding to the UCC that such actions will not be subject to the Challenge Budget.

23.     Finally, as to its request for automatic standing for any Challenge, the UCC's position is again against the weight of authority.  It is standard procedure in chapter 11 cases that committees must seek derivative standing via motion practice in order to pursue colorable claims on behalf of a debtor-in-possession.  In arguing why the Court should deviate from the standard procedural safeguards associated with derivative standing, the UCC relies on *In re Quebecor World (USA) Inc.*, Case No. 08-0152 (JMP) [Docket No. 470] (Bankr. S.D.N.Y. Apr. 1, 2008), and *In re Dana Corp.*, Case No. 06-10354 (BRL) [Docket No. 721] (Bankr. S.D.N.Y. Mar. 29, 2006), but these cases should be given little if any precedential value, especially given that the issue of automatic standing was not contested by the parties.  Adhering to the procedure of requiring the UCC to seek standing through motion practice does not limit the UCC from eventually bringing colorable claims on behalf of the Debtors, but it does protect the Debtors' estates from the burden of excessive costs and inefficiencies.

    **D.**    **Waiver of Surcharge Under Section 506(c), Equities of the Case Exception Under Section 552(b), Marshaling, and the Pricing and Fees Related to the DIP Facility Are Appropriate and Should Be Approved.**

24.     Both the U.S. Trustee and the UCC make several other objections, including with respect to the waiver of the rights to surcharge collateral under section 506(c) of the Bankruptcy Code (U.S. Trustee Obj., ¶¶ 21-23; UCC Obj., ¶¶ 21, 22), waiver of the equities of the case exception pursuant to section 552(b) of the Bankruptcy Code (UCC Obj., ¶¶ 2, 10, 23), waiver of the equitable doctrine of marshaling (U.S. Trustee Obj., ¶ 23; UCC Obj., ¶¶ 2, 10, 21-25, 33), and

the pricing and fees under the DIP Facility (UCC Obj., ¶ 34).[10]  As an initial matter, these DIP Facility terms and conditions were each specifically negotiated for by the DIP Agent and the DIP Lenders as a material inducement for such parties to enter into and provide the DIP Facility and, moreover, are customary, market, and regularly approved in this jurisdiction and others.  As such, the Court should approve the DIP Facility in its entirety, including these provisions.

25.   **Waiver of Surcharge Under Section 506(c)**.  The waiver of 506(c) claims was exchanged for the benefit of the DIP Facility and the use of the DIP Lenders' and Prepetition Lenders' Cash Collateral, which is being used to fund these chapter 11 cases.  Courts within this District routinely approve 506(c) waivers where debtors, in their business judgement, believe such waivers are an appropriate exchange for suitable DIP financing.  *See*, *e.g.*, *In re CiCis Holdings, Inc.*, No. 21-30146 (SGJ) [Docket No. 130] (Bankr. N.D. Tex. Feb. 18, 2021); *In re Studio Movie Grill Holdings, LLC*, No. 20-32633 (SGJ) [Docket No. 280]  (Bankr. N.D. Tex. Dec. 1, 2020); *In re Trivascular Sales LLC*, No. 20-31840 (SGJ) [Docket No. 268] (Bankr. N.D. Tex. Aug. 14, 2020); *In re Vista Proppants and Logistics, LLC*, No. 20-42002 (ELM) [Docket No. 219] (Bankr. N.D. Tex. Jul. 16, 2020).  Moreover, the Debtors have the sole discretion regarding whether to grant a section 506(c) waiver in exchange for the DIP Facility; such discretion was properly exercised given that without the DIP Facility, there would be no financing available for these cases at all.  Here, additionally, the DIP Agent agreed to the Carve Out to ensure the availability of funds to pay estate professionals in the event of a termination of the DIP Facility.  For the foregoing

---

[10]   While the UCC Objection asserts several other issues not raised herein, the DIP Agent focuses this Reply on what it believes to be the most material issues before the Court; notwithstanding the foregoing, for the avoidance of doubt, the DIP Agent expressly reserves all rights to raise and respond to issues as appropriate and does not waive any rights with respect to any arguments raised by either the U.S. Trustee, the UCC, or any other party.

reasons, the Court should defer to the Debtors' business judgment, particularly as the surcharge waiver here was the result of good faith negotiations between the Debtors and the DIP Lenders.

26. __Waiver of the Equities of the Case Exception Under Section 552(b)__.  Neither the U.S. Trustee nor the UCC have provided any well-founded legal argument or factual evidence suggesting the "equities of the case" exception could or should apply here.  A waiver of the "equities of the case" exception under section 552(b) is justified where, as here, the waiver is  used to induce lenders to lend or consent to use of cash collateral.  The Debtors here agreed in their business judgment to waive the estate's right to seek to impose section 552(b)'s "equities of the case exception"  in exchange for favorable post-petition financing from the DIP Lenders.   The Debtors' sound exercise of such business judgment following negotiations between the Debtors and the DIP Lenders should not be disturbed.

27. __Waiver of the Equitable Doctrine of Marshaling__.  The U.S. Trustee and the UCC also object to the doctrine of marshaling waiver.  As a threshold matter, neither party appears to have standing to raise such an objection, given that the doctrine of marshaling is an equitable doctrine for the benefit of junior *secured* creditors.  *E.g.*, *Galey & Lord, Inc. v. Arley Corp.* (*In re Arlco, Inc.*), 239 B.R. 261, 274 (Bankr. S.D.N.Y. 1999); *Fundex Capital Corp. v. Balaber-Strauss (In re Tampa Chain Co.)*, 53 B.R. 772, 777 (Bankr. S.D.N.Y. 1985).  As a threshold matter, neither the U.S. Trustee nor the UCC are secured parties and thus lack standing to object to the waiver proposed by the Final DIP Order.  *See*, *e.g.*, *Galey & Lord, Inc. v. Arley Corp.* (*In re Arlco, Inc.*), 239 B.R. 261, 274 (Bankr. S.D.N.Y. 1999) (holding that unsecured creditors have no right to invoke the doctrine of marshaling) (citing *Herkimer Cnty. Tr. Co. v. Swimelar* (*In re Prichard*), 170 B.R. 41, 45 (Bankr. N.D.N.Y. 1994)); *see also Interfirst Bank Fannin v. Bernell (In re Mesa Intercontinental, Inc.)*, 79 B.R. 669, 672 (Bankr. S.D. Tex. 1987) (holding that an unsecured

creditor "falls outside the class of creditors able to request [marshaling]").  Here, there are no junior creditors.  Regardless, as with the other issues raised in the objections, the waiver to the doctrine of marshaling was specifically negotiated for by the DIP Agent and the DIP Lenders as a material inducement into providing the DIP Facility and funding these cases.  This Court has frequently approved waivers of the doctrine of marshaling in recent post-petition financing orders and should do so here.  *See*, *e.g.*, *In re CiCis Holdings, Inc.*, No. 21-30146 (SGJ) [Docket No. 130] (Bankr. N.D. Tex. Feb. 18, 2021); *In re Studio Movie Grill Holdings, LLC*, No. 20-32633 (SGJ) (Bankr. N.D. Tex. Dec. 1, 2020) [Docket No. 280]; *In re Trivascular Sales LLC*, No. 20-31840 (SGJ) [Docket No. 268] (Bankr. N.D. Tex. Aug. 14, 2020); *In re Vista Proppants & Logistics, LLC*, No. 20-42002 (ELM) [Docket No. 219] (Bankr. N.D. Tex. Jul. 16, 2020).

28.    **Pricing and Fees**.  The UCC makes a short, unsupported assertion that the DIP Facility pricing and fees are excessive, without providing any legal precedent or market evidence.  The Court should overrule this conclusory objection.  Not only are the economic terms of the DIP Facility well within market and agreed to by the Debtors in their business judgment, the facts of these cases and the market evidence from the Debtors amply supports the pricing and fees of the DIP Facility.  The DIP Facility is the Debtors' best only financing option—the pricing and fees associated with the DIP Facility are material economic terms without which the DIP Lenders would not fund, and, without such funding, all stakeholders, including the UCC and its constituents, would lose the clear benefit from such funding and the preservation and orderly monetization of the Debtors' estate.

## **RESERVATION OF RIGHTS**

29.     The DIP Agent and the DIP Lenders reserve the right to address or rebut any of the

U.S. Trustee's or the UCC's additional objections, arguments and evidence at the final hearing on

the Motion.


*[Remainder of page intentionally left blank.]*

## CONCLUSION

**WHEREFORE**, the DIP Agent respectfully requests that the Court (a) enter the Proposed

Final Order in the form filed at [Docket No. 238], (b) overrule the Objections, and (c) grant such

other relief to the Debtors, the DIP Agent and the DIP Lenders as is just and proper.

Dated:  January 25, 2024
Dallas, TX

*/s/ John J. Kane*
KANE RUSSELL COLEMAN LOGAN PC
John J. Kane (24066794)
JaKayla DaBera (24129114)
901 Main Street, Suite 5200
Dallas, TX 75202
Telephone:     (214) 777-4200
Facsimile:      (214) 777-4299
Email:            jkane@krcl.com
                       jdabera@krcl.com

*and*

MAYER BROWN LLP
Brian Trust (admitted *pro hac vice*)
Sean T. Scott (admitted *pro hac vice*)
Jamie Netznik (admitted *pro hac vice*)
Dabin Chung (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020
Telephone:     (212) 506-2500
Facsimile:      (212) 262-1910
Email:            btrust@mayerbrown.com
                       stscott@mayerbrown.com
                       jnetznik@mayerbrown.com
                       dchung@mayerbrown.com

*Attorneys for Regions Bank as the DIP Agent*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 25, 2024, a true and correct copy of the foregoing Reply was filed with the Court and served via the Court's Electronic Case Filing System (ECF) upon all parties receiving such service in this bankruptcy case.

*/s/ John J. Kane*

John J. Kane